897 A.2d 388 (2006)
385 N.J. Super. 350
STATE of New Jersey, Plaintiff-Appellant,
v.
Alturik FRANCIS, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 9, 2006.
Decided May 10, 2006.
*389 Theodore J. Romankow, Union County Prosecutor, attorney for appellant (Steven J. Kaflowitz, Assistant Prosecutor, of counsel and on the brief).
Glazer & Luciano, Livingston, and Carl J. Herman, attorneys for respondent (Mr. Herman and David B. Glazer, of counsel; Mr. Herman, on the brief).
Before Judges LINTNER, HOLSTON, JR. and GILROY.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
This appeal requires us to define the "dominant purpose" test as it applies to pre-indictment proceedings before a grand jury,[1] whether the State conducted itself properly under the test, and what sanctions, if any, should be imposed for its violation. Generally it is appropriate for the State to question witnesses before a grand jury on subjects relevant to the grand jury's investigation which relate to a *390 pending indictment. However it is not proper to use a grand jury for the sole or dominant purpose of preparing a case for the penalty phase of a defendant's capital trial. Such use is violative of the "dominant purpose" test and constitutes a misuse of the grand jury.
The State of New Jersey appeals the Law Division's July 13, 2005 interlocutory order precluding the State, in the capital murder trial of defendant, Alturik Francis, from utilizing defendant's family members' testimony before the Union County grand jury on January 31, 2003 for any purpose, with the exception that the State may, subject to the discretion of the trial judge, utilize at trial inculpatory statements allegedly made by defendant to a family member. We affirm the court's order as modified by this opinion.
We hold that the "dominant purpose" test was correctly utilized and applied by the trial judge in determining whether the assistant prosecutor (prosecutor) misused the pre-indictment grand jury by obtaining mitigation evidence to be used at the penalty phase of defendant's trial. We, however, modify the July 13, 2005 order to permit the prosecutor to use the grand jury record to impeach any family member's testimony or expert testimony based on family member's statements that are offered by defendant at the guilt phase of defendant's trial. The prosecutor may also utilize at trial any inculpatory statements made by defendant to a family member.
On February 26, 2003, at a subsequent session, the grand jury returned its Indictment No. 03-02-00170 against defendant charging him, in thirteen counts, with three counts of first-degree murder for the deaths of Majuly Collins, Catherine Almazal and Eduardo Almazal, in violation of N.J.S.A. 2C:11-3a(1) and (2) (Counts One to Three); three counts of first-degree felony murder for the deaths of Majuly Collins, Catherine Almazal and Eduardo Almazal, in violation of N.J.S.A. 2C:11-3a(3) (Counts Four to Six); first-degree attempted murder of Susan Vargas, in violation of N.J.S.A. 2C:11-3 and 2C:5-1 (Count Seven); second-degree burglary, in violation of N.J.S.A. 2C:18-2 (Count Eight); first-degree robbery, in violation of N.J.S.A. 2C:15-1 (Count Nine); first-degree aggravated sexual assault, in violation of N.J.S.A. 2C:14-2a(3) and (4) (Count Ten); two counts of third-degree possession of a knife with the purpose to use it unlawfully against the persons of Majuly Collins and Susan Vargas, in violation of N.J.S.A. 2C:39-4d (Counts Eleven to Twelve); and fourth-degree unlawful possession of a knife under circumstances not manifestly appropriate, in violation of N.J.S.A. 2C:39-5d (Count Thirteen).
A notice of aggravating factors was served by the State on the defense for all three murders, indicating the State's intention to seek the death penalty. Thereafter, pursuant to State v. Fortin, 178 N.J. 540, 632, 843 A.2d 974 (2004), the State again presented this matter to the grand jury. On June 17, 2005, a second notice of aggravating factors, listing the same factors, was handed up.
On April 15, 2003, defendant filed two notices: (1) that he would assert the defense of diminished capacity, pursuant to N.J.S.A. 2C:4-2, and (2) that he would claim the defense of intoxication, pursuant to N.J.S.A. 2C:2-8d.
On March 8, 2004, defendant, alleging prosecutorial misconduct in the use of the grand jury on January 31, 2003, moved to dismiss the indictment and sought other relief. Defendant contended that the prosecutor had improperly questioned four of his closest family members before the grand jury in an effort to obtain penalty *391 phase mitigation evidence and circumvent the restrictions of Rule 3:13-4(b).
On August 2, 2004, the judge issued a written opinion denying defendant's request that the indictment be dismissed, that the Union County Prosecutor's Office be recused from prosecuting the indictment, and that the death penalty be barred. He ruled, however, that the State was precluded from using the testimony of the four members of defendant's family "in any proceeding in this case." We granted the State's motion for leave to appeal on August 25, 2005.
The State's investigation indicates that during the early morning hours of December 7, 2002, Majuly Collins, age thirty-two, her son, Eduardo Almaza, age four, and her daughter, Catherine Almaza, eighteen months, were killed in their apartment in Elizabeth. Majuly Collins was sexually assaulted and stabbed and her children were suffocated. The three bodies were found in the apartment bathtub. Susan Vargas, age twenty-one, had been living temporarily with Majuly Collins and was also stabbed. Vargas feigned her death, and after her assailant left the apartment, she contacted a relative and the police were notified. Although seriously injured, Vargas told the police that the black male who lived in the downstairs apartment was responsible for what had occurred.[2]
Based upon the particularly gruesome nature of the triple homicide, the State immediately began to focus on aggravating factors in support of the death penalty. Investigators for the county prosecutor obtained school records and court documents. Former school administrators, teachers and employers were asked about defendant's use of drugs or alcohol, his mental health and whether he suffered from blackouts, hearing voices, or hallucinations. The inquiry was clearly appropriate and acceptable investigatory conduct.
On January 31, 2003, the prosecutor presented testimony from defendant's step-father, George Martin, mother, Diane Martin, sister, Kinaya Houston and brother-in-law, Tony Houston to the grand jury. At the outset of the proceedings, the prosecutor announced to the grand jurors that they would not be hearing evidence "at this point" to determine whether to hand up an indictment.
On February 26, 2003, the State presented the testimony of Detectives Ismael Olivero and Carl Riley, as well as twenty exhibits, including Vargas' statement and defendant's four confessions. Based on that evidence, the grand jury returned its indictment.
Defendant contends that the prosecutor improperly used the grand jury on January 31 to uncover facts relevant to his penalty phase mitigation claims in violation of Rule 3:13-4(b). The State contends that there were legitimate grounds for obtaining the January 31, 2003 testimony of defendant's family members. It argues it was engaged in an appropriate pre-indictment investigation to inquire into the mental state necessary for the commission of the crimes charged, i.e., whether defendant performed the acts purposely or knowingly, and whether there were facts that would support an intoxication or diminished capacity defense.
*392 The judge, relying on the "dominant purpose" test utilized in the factually similar case of United States v. Furrow, 125 F.Supp.2d 1170 (C.D.Cal.2000), determined that the prosecutor's "dominant purpose" for calling the four witnesses before the grand jury was:
to advance the discovery process related to a possible penalty phase of the case. . . . The questions posed the defendant's relatives only [tangentially] related to his mental state at the time of the offense. The questioning of the witnesses regarding childhood behavior and prior crimes was an attempt to circumvent the restrictions of R. 3:13-4 and obtain penalty mitigation evidence prior to trial.
The judge reached his conclusion after making the following findings of fact: 1) the prosecutor told the grand jurors in February to ignore the testimony heard in January because it had been elicited for a purpose other than considering whether or not to indict defendant; 2) the prosecutor told the grand jurors in January that the purpose of the testimony was to specifically explore defendant's motive for the December 7, 2002 murders, motive not being an element of the crimes charged; 3) the prosecutor failed to produce evidence before the grand jury in January on the affirmative defense of intoxication; and 4) the family members' testimony pertaining to defendant's childhood behavior, history of physical or sexual abuse, abandonment by his father, and prior acts of violence was not relevant to the decision whether to indict defendant or to negate defendant's possible affirmative defenses.
Thereafter, the judge issued clarification opinions on January 12 and June 14, 2005. His ultimate ruling, which is the subject matter of this appeal, was memorialized in the July 13, 2005 order.
After we granted the State's leave to appeal, and subsequent to filing briefs, defendant served the State with an expert psychiatric report concerning defendant's intoxication defense. The State moved to expand the record to include the report, or remand the matter to the judge for further consideration. The motion to expand the record or remand was denied on December 13, 2005, because the reports were not before the judge at the time he made his decision, and the matter was scheduled before this court.
The State presents the following arguments:
POINT I
THE STATE ACTED PROPERLY BY CONDUCTING GRAND-JURY PROCEEDINGS THAT THOROUGHLY INVESTIGATED THE CRIMES AT ISSUE BEFORE SEEKING AN INDICTMENT.
POINT II
THE TRIAL COURT'S ORDER PRECLUDING THE USE OF THE GRAND-JURY TESTIMONY EVEN FOR THE PURPOSE OF IMPEACHMENT CONTRAVENES THE TRUTH-SEEKING FUNCTION OF TRIALS.

I
The State argues that (1) the ruling embraces the idea that a grand jury may not thoroughly investigate facts relevant to guilt if those facts might also be relevant to mitigation claims at a penalty proceeding; (2) the ruling wrongly applied the "dominant purpose" test, which was devised to regulate post-indictment grand jury actions, to pre-indictment investigative grand jury proceedings; and (3) the trial court did not undertake an objective analysis of the prosecutor's grand jury presentation.
*393 The concept that the grand jury is entitled to engage in an exhaustive investigation is well established. Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 643 (1972); State v. Doliner, 96 N.J. 236, 249-50, 475 A.2d 552 (1984). It is "[t]he prosecutor's function with respect to the grand jury . . . to direct the investigation and propose the witnesses to be subpoenaed by the grand jury." State v. Johnson, 287 N.J.Super. 247, 258, 670 A.2d 1100 (App.Div.), certif. denied, 144 N.J. 587, 677 A.2d 759 (1996). Moreover, prosecutors undertake that role because they are obliged to "use all reasonable and lawful diligence for the detection. . . [and] indictment . . . of offenders against the laws." N.J.S.A. 2A:158-5; accord, In re Grand Jury Appearance Request by Loigman, 183 N.J. 133, 142, 870 A.2d 249 (2005).
In Branzburg, the Supreme Court articulated the broad scope of the grand jury's investigative powers:
Because [the grand jury's] task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime."
[Branzburg, supra, 408 U.S. at 688, 92 S.Ct. at 2660, 33 L.Ed.2d at 643 (quoting Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979, 983 (1919)).]
Branzburg further explained that the grand jury has a right to every person's evidence:
[T]he grand jury's authority to subpoena witnesses is not only historic, but essential to its task. Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that "the public. . . has a right to every man's evidence," except for those persons protected by a constitutional, common-law, or statutory privilege, is particularly applicable to grand jury proceedings.
[Id. at 688, 92 S.Ct. at 2660, 33 L.Ed.2d at 643 (citations omitted).]
Our Supreme Court stated in In re Addonizio, 53 N.J. 107, 134, 248 A.2d 531 (1968), "[w]e think it fitting to stress the need for broad power in the police and the grand jury to probe widely for evidence of crime." "And if the investigation is to be meaningful," Addonizio adds, "`[s]ome exploration or fishing necessarily is inherent and entitled to exist. . . .'" Id. at 126, 248 A.2d 531 (quoting Schwimmer v. United States, 232 F.2d 855, 862-63 (8th Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956)).
The State cites In re Petition to Compel Testimony of Tuso, 73 N.J. 575, 376 A.2d 895 (1977), in support of its position that there must be a distinction between post-and pre-indictment grand jury investigations. Our Supreme Court in Tuso stated:
The court may not hamstring a prosecuting official in his marshalling of evidence before a grand jury on any finespun distinctions between what evidence is sufficient to return a valid indictment and what is necessary to convict. Moreover, the measure of the prosecutor's discretion or judgment in such matters extends to the grand jury's responsibility for investigation of crime as well as the return of indictments. The [prosecution] must in the public interest be afforded broad authority to decide what avenues to pursue before the grand jury *394 in the investigation and prosecution of crime.
[Id. at 580, 376 A.2d 895 (citation omitted).]
However, the District Court in Furrow, relied upon by the judge, stated:
"The investigative power of a grand jury does not necessarily end with the return of an indictment." United States v. Jones, 129 F.3d 718, 723 (2d Cir.1997). Rather, "[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined. . . ." Branzburg v. Hayes, 408 U.S. at 701[, 92 S.Ct. 2646]. However, use of the grand jury as a means for criminal discovery is prohibited. See, e.g., In re Antitrust Grand Jury Investigation, 714 F.2d 347, 349 (4th Cir.1983); United States v. Kovaleski, 406 F.Supp. 267, 269 (E.D.Mich. 1976) ("The calling of witnesses before a grand jury for the dominant purpose of gathering evidence for use in a pending case is improper.").
[Furrow, supra, 125 F.Supp.2d at 1172 (emphasis added).]
See also United States v. Dardi, 330 F.2d 316, 336 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964) (holding it would be improper to use a grand jury for the sole purpose of preparing an already pending indictment for trial).
In United States v. Moss, 756 F.2d 329, 332 (4th Cir.1985), the Fourth Circuit documented cases from six circuit courts of appeal, constituting a majority of the circuit courts, that have adopted the "dominant purpose" test in determining whether there has been prosecutorial misconduct in the prosecution's use of a grand jury post-indictment.[3] Additional cases from the circuit courts of appeal cited in Moss, as well as cases from the Tenth and Eleventh Circuit Courts of Appeal have also adopted the "dominant purpose" test in determining prosecutorial misuse of a grand jury.[4] The test has been adopted in six reported State court opinions.[5] It has also been *395 utilized by the District Court for the District of New Jersey in United States v. Bissell, 954 F.Supp. 841 (D.N.J.1996), aff'd o.b., 142 F.3d 429 (3d Cir.1998).
We are convinced, based on the extensive authority throughout the country, that the "dominant purpose" test applies when considering allegations of prosecutorial misconduct by the post-indictment misuse of a grand jury. We must next decide whether the "dominant purpose" test applies equally in pre-indictment situations. Our research has uncovered only two cases that have applied the dominant purpose test to an issue of alleged prosecutorial misconduct prior to an indictment being handed up. The most recent case is an unpublished case from the Second Circuit, United States v. Fulton, 1997 U.S.App. LEXIS 654 (2d Cir.1997).[6] In that case, the defendant claimed that prior to his indictment, the government improperly subpoenaed a witness. Id. at * 2. The court, relying on the "dominant purpose" test, found no error in the trial court's determination that the witness was not subpoenaed for the "dominant purpose" of trial preparation. Id. at * 4.
In United States v. Phillips, 577 F.Supp. 879 (N.D.Ill.1984), the defendant contended that the government had used the grand jury's subpoena power in place of discovery to prepare for trial since the documents were obtained only hours before the grand jury returned its indictment and could not possibly have been considered in the grand jury's deliberations. Id. at 880. While acknowledging that the government could "not utilize a grand jury for the sole or primary purpose of gathering evidence for use in a pending trial," the court held that the government had the "right to continue a grand jury investigation, even when the evidence received may also relate to a pending indictment." Ibid. After reviewing the documents involved in camera, the court determined that the documents were relevant to the grand jury's continuing investigation, and thus there was no abuse of the grand jury process. Ibid.
Fulton and Phillips are noteworthy because they make no distinction between pre- and post-indictment conduct in stating the standard. Additionally, these cases cite other cases which set forth the "dominant purpose" test. See Zarattini, supra, 552 F.2d at 757; Leung, supra, 40 F.3d at 581.
It is logical that a prosecutorial misconduct claim in connection with grand jury use would arise more frequently in post-indictment cases because the purpose of the grand jury is to determine whether "a basis exists for subjecting the accused to a trial. . . ." Trap Rock Indus., Inc. v. Kohl, 59 N.J. 471, 487, 284 A.2d 161 (1971), cert. denied, 405 U.S. 1065, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Before an indictment, all evidence relevant to that determination can come before a grand jury. Situations involving the use of the grand jury simply to gather evidence for trial are more likely to arise once the indictment is obtained *396 than in circumstances before the grand jury has indicted the accused.
We are convinced, however, that the "dominant purpose" test is equally applicable pre-indictment. If the evidence presented by a prosecutor has no relevance to the determination of whether there is sufficient evidence of a defendant's guilt to indict or of the defenses that might negate that guilt or whether to impose a capital or non-capital penalty, then there is a misuse by the prosecutor of the grand jury whether pre-indictment or post-indictment. The question is whether, under the specific circumstances of this case, the prosecutor used the grand jury process for the "dominant purpose" of preparing the case for the penalty phase of defendant's trial. The facts support that conclusion.
The prosecutor began his presentation on January 31, with the following instructions:
The first matter is the investigation regarding State versus Francis, that's Alteric [sic] Francis. When I say investigation you're not going to be hearing evidence on this case at this point to determine whether or not to hand up an indictment. This is an investigative function of the Grand Jury where the purpose of this proceeding is to gather information by way of general background and I will keep it somewhat general because I anticipate that you will be hearing this case for presentation by the time your term is up.
The prosecutor then told the grand jury that the witnesses would be defendant's family members who were asked "to come here today . . . because they did not wish to speak voluntarily with the police." He continued by saying:
The basic question that is going to be asked of these people is to find out backgrounds about Alturik Francis, to get some kind of insight as to what happened on this day, if there was anything in his upbringing, his childhood, or in his young adult life, he was 23 years old, that would shed light as to why he may have committed these particular acts. And factually I will leave it at that, but that is going to be the essence of the questioning as if, "Tell us everything that you know about Alturik."
The prosecutor told the grand jury that the questioning might be awkward but it was information "that becomes very important as this case proceeds through, through the criminal justice system in an effort to explain why this happened or if there is any explanation or if there's no explanation." Answering a grand juror's question, the prosecutor replied, "[s]hould this case come to you for consideration as to indictment, at that time I will be advising you as to what role today's proceedings play."
All four witnesses were asked similar questions regarding defendant's history from childhood of behavioral and/or psychiatric problems, including whether he ever complained of hearing voices or having hallucinations. They were also each questioned about defendant's history of drug, alcohol, physical and sexual abuse, and defendant's history of violence.
Toward the end of the step-father's questioning, the prosecutor asked whether he had any conversations with defendant after his arrest concerning defendant's involvement in the crimes and the details of his involvement in them.[7] Defendant's *397 mother was asked whether she had ever spoken to anyone else about the case. When she indicated that she believed she had spoken to a social worker, the prosecutor asked her the name of the person she had spoken to, the substance of the conversation, whether that person was employed by the lawyers who represented her son, whether the interview was audio taped, whether the person to whom she had spoken was from "Alfonzo Associates," a mitigation investigation firm that works for defendants in death penalty cases, and whether the social worker/counselor had interviewed anyone else.
Defendant's sister testified that, at the time of the crimes, defendant lived with her family and that the victims lived upstairs from her apartment. Defendant's brother-in-law was asked about defendant's demeanor when he saw him the morning after the commission of the crimes, the clothing defendant was wearing, and whether defendant appeared to be intoxicated.
At the conclusion of the testimony, the prosecutor admitted to the grand jurors that he asked about "Alfonzo Associates" because he knew that there was a law firm that "uses them to do a lot of their background." The prosecutor also told the grand jurors that the State was convinced, based upon the testimony of the surviving victim, that the defendant was the only individual involved in the crimes.
When the grand jury met again on February 26, 2003, the prosecutor opened by telling it that it should make a determination on the case limited to and based on the evidence it hears on this day. He went on to say, "The entire case is going to be presented today. So if you were not here the last time, you're in the same shoes as everyone else . . . ."
The comments by the prosecutor demonstrate that the "dominant purpose" of the January 31 presentation was not to determine whether there was sufficient evidence to indict defendant of a crime, or to investigate the crimes at issue before seeking an indictment. The State's contention that the grand jury was investigating the defenses of diminished capacity and intoxication is negated by the prosecutor's instruction not to consider the evidence it heard earlier in deciding whether to indict.[8]
The State maintains that it is wrong to evaluate the prosecutor's dominant purpose based on his subjective intent because two identical presentations could lead to different outcomes depending on what the prosecutor stated to the grand jurors. However, the hypothetical inconsistent result suggested by the State does not exist here because the prosecutor specifically told the grand jurors not to consider the information from the four witnesses in their subsequent determination of whether to indict.
Similarly, in Johnson, supra, 287 N.J.Super. at 261, 670 A.2d 1100, this court determined from the prosecutor's statement to the trial judge that the prosecutor's purpose in calling his witness, Rhonda Thomas, before the grand jury was to preserve her testimony for trial. Thus, contrary to the State's argument, the prosecutor's subjective intent is quite relevant.
In Johnson, prior to the grand jury testimony of Thomas, Investigator LaFera stated that Thomas had told him that she was reluctant to testify at the defendant's *398 trial because she feared retaliation from the defendants. Id. at 260, 670 A.2d 1100. "Thomas then testified [to the grand jury] that after hearing the shots she saw the [defendants] run from the building." Ibid.
We determined that "The inescapable conclusion from [LaFera's] statement is that Thomas was brought before the grand jury solely to preserve her testimony for trial." Id. at 261, 670 A.2d 1100. "The second grand jury panel was not conducting a further investigation concerning the. . . murder or any actions by defendants after the shooting." Ibid. In Johnson, we reiterated the well established principle that "use of the grand jury solely to prepare and preserve the testimony of a witness for the trial of a pending indictment is an abuse of the grand jury." Id. at 259, 670 A.2d 1100. "The use to which the prosecutor put this second grand jury was improper. . . ." Id. at 261, 670 A.2d 1100.
Similarly here, the prosecutor's comments refute the suggestion that he was interested in exploring defendant's defense of intoxication when he told the grand jurors after the witnesses had left that "we got the toxicology report back, there was no alcohol back on his blood or urine. There was a small amount of marijuana, that's it."
We are convinced that the prosecutor was not presenting defendant's family members to investigate defendant's state of mind, but instead for the "dominant purpose" of obtaining mitigation evidence to be used for impeachment purposes at the penalty phase of the trial, in violation of defendant's rights.
We, therefore, affirm the judge's finding of prosecutorial misconduct because the prosecutor's "dominant purpose" constituted a misuse of the grand jury.

II
When there has been prosecutorial misconduct in the grand jury process, the question becomes whether the State obtained an "undue advantage" due to the prosecutor's actions. Johnson, supra, 287 N.J.Super. at 261, 670 A.2d 1100. Because in Johnson we determined that the State had not obtained an undue advantage or denied the defendant a fair trial in the presentation of its case through the prosecutor's action, we declined to reverse the defendant's conviction. Ibid.
This is an interlocutory appeal. The situation here is different from most cases where prosecutorial misconduct is alleged, after the trial has been conducted. With that difference in mind, we take the opportunity to fashion a fair remedy that will both protect defendant during the penalty phase from the prosecutor's misconduct and, at the same time, permit the State to make proper use of the grand jury testimony during the guilt phase of the trial.
The State argues that, even assuming error by the State in asking questions to defendant's family, that went beyond his conduct and whereabouts at the time of the crimes and what he may have said afterwards about the crimes to his family, the remedy devised by the court precluding that testimony even for impeachment purposes goes too far in a criminal justice system with the fundamental goal of determining the truth. We agree.
We are satisfied that the judge's remedy precluding the use of mitigation testimony at the penalty phase of the trial in this matter is amply supported by evidence in the record. However, we are equally convinced that the judge's remedy in precluding the use of the testimony for any purpose, with the exception of inculpatory statements made by defendant to a family member, is not appropriate under the circumstances.
*399 In State v. Burris, 145 N.J. 509, 679 A.2d 121 (1996), our Supreme Court was asked to consider whether the State may use a statement obtained in violation of a defendant's right to counsel under the Fifth Amendment and the State's common law privilege against self-incrimination for impeachment purposes. Id. at 514, 679 A.2d 121. In a thorough discussion of the issue, the Court answered the question in the affirmative. Id. at 538, 679 A.2d 121.
Our Supreme Court in Burris adopted the impeachment exception set forth in Harris v. New York, 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1, 5 (1971). Burris, supra, 145 N.J. at 524, 679 A.2d 121 (citing State v. Irving, 114 N.J. 427, 555 A.2d 575 (1989); State v. Miller, 67 N.J. 229, 337 A.2d 36 (1975); State v. Davis, 67 N.J. 222, 337 A.2d 33 (1975), cert. denied, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976)). The Burris Court was convinced "[i]f a defendant should falsely testify about a matter to which the State has contrary evidence, then the State need not sit idly by." Id. at 530-31, 679 A.2d 121.
We believe by analogy that the Miranda[9] exclusionary rule exception ratified by Burris is applicable here. Defendant's family testified under oath before a grand jury. If they testify at the guilt phase of defendant's trial in any manner at odds with their grand jury testimony, Burris supports the right of the State to use their prior-inconsistent testimony to impeach them. The State must be allowed to do so in order to preserve the integrity of the judicial system in its overriding truth-seeking function.
The same is true of an expert who testifies for the defense relying on the family members' testimony. An expert can consider information supplied by the grand jury witnesses in formulating an opinion on intoxication or diminished capacity. However, a defendant should not be permitted to accomplish indirectly, through expert testimony, what he may not accomplish directly through lay witness testimony.
In keeping with Burris and Johnson, we are convinced that a proper balance will be achieved by a modification of the judge's sanction for the prosecutor's misuse of the grand jury by permitting the use of the grand jury record to impeach any family member's testimony or expert witness testimony based on family members' statements offered by defendant at the guilt phase of trial. The State may also use for any purpose any inculpatory statements made by defendant to a family member. However, the mitigation testimony obtained from family members may not be used for any purpose at the penalty phase of trial.
Affirmed in part and modified in part.
NOTES
[1] The decisions cited in this opinion referring to the "dominant purpose" test refer to the test as either the "sole or dominant purpose" test, the "sole or dominating purpose" test, or the "sole or primary purpose" test. In order to avoid confusion, we refer to the test throughout this opinion as the "dominant purpose" test.
[2] Within forty-eight hours of the commission of the crimes, law enforcement authorities had developed substantial evidence, sufficient to obtain an indictment, that defendant had committed the crimes charged. This evidence included Vargas' detailed statement of what had happened, her identification of defendant as the assailant and defendant's four sworn confessions, each providing additional incriminating details. Additionally, blood stains were found on defendant's clothing.
[3] United States v. (Under Seal), 714 F.2d 347, 350 (4th Cir.), cert. dismissed, 464 U.S. 978, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983); In re Grand Jury Proceedings (Johanson), 632 F.2d 1033, 1041 (3d Cir.1980); In Re Grand Jury Subpoenas, 581 F.2d 1103, 1108 (4th Cir. 1978), cert. denied, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979); United States v. Zarattini, 552 F.2d 753, 756 (7th Cir.), cert. denied, 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977); United States v. Woods, 544 F.2d 242, 250 (6th Cir.1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); United States v. Sellaro, 514 F.2d 114, 121-22 (8th Cir.1973), cert. denied, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975); Dardi, supra, 330 F.2d at 336.
[4] United States v. Bros. Constr. Co., 219 F.3d 300, 314 (4th Cir.), cert. denied, 531 U.S. 1037, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000); United States v. Salameh, 152 F.3d 88, 109 (2d Cir.), cert. denied, 526 U.S. 1028, 119 S.Ct. 1273, 143 L.Ed.2d 368 (1999); United States v. Alred, 144 F.3d 1405, 1413 (11th Cir.1998); United States v. Leung, 40 F.3d 577, 581 (2d Cir.1994); United States v. Rugiero, 20 F.3d 1387, 1395 (6th Cir.), cert. denied, 513 U.S. 878, 115 S.Ct. 208, 130 L.Ed.2d 137 (1994); United States v. Badger, 983 F.2d 1443, 1458 (7th Cir.), cert. denied, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993); United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979).
[5] Agrella v. Rivkind, 404 So.2d 1113, 1114 (Fla.Dist.Ct.App.1981); People v. DeLaire, 240 Ill.App.3d 1012, 183 Ill.Dec. 33, 610 N.E.2d 1277, 1288, appeal denied, 151 Ill.2d 569, 186 Ill.Dec. 387, 616 N.E.2d 340 (1993); Bishop v. Caudill, 87 S.W.3d 1, 2 (Ky.2002); Erman v. State, 49 Md.App. 605, 434 A.2d 1030, 1044 (1981), cert. denied sub nom. Brent v. Maryland, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982); Hynes v. Lerner, 44 N.Y.2d 329, 405 N.Y.S.2d 649, 376 N.E.2d 1294, 1296, cert. denied, 439 U.S. 888, 99 S.Ct. 243, 58 L.Ed.2d 234 (1978); Commonwealth v. Lang, 517 Pa. 390, 537 A.2d 1361, 1366 (1988).
[6] While Rule 1:36-3 generally restricts courts from citing an unpublished opinion as precedential authority, a court may cite an unpublished opinion as a "secondary authority." Pressler, Current N.J. Court Rules, comment 2 on R. 1:36-3 (2006); see Marjarum v. Twp. of Hamilton, 336 N.J.Super. 85, 98, 763 A.2d 796 (App.Div.2000) (treating an unpublished opinion of another panel as persuasive authority for their decision). The United States Supreme Court approved on April 19, 2006 Federal Rule of Appellate Procedure 32.1, which permits attorneys to cite unpublished opinions in the federal circuit courts and does not dictate the precedential value that federal appellate courts can assign to unpublished opinions.
[7] Defendant's step-father, sister and brother-in-law were also asked questions concerning Jeffrey Corbit, defendant's cousin, who defendant first implicated but later retracted as being a co-participant with him in the crimes and about defendant's living arrangement with defendant's sister in a downstairs apartment from the victims' apartment.
[8] That fact also distinguishes this case from Furrow, supra, 125 F.Supp.2d at 1175. In Furrow, no instructions were given by the prosecutor to the grand jury to disregard testimony concerning the defendant's character and personal practices.
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).