926 A.2d 305

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. ALTURIK FRANCIS, DEFEN-
DANT–APPELLANT AND CROSS–RESPONDENT.

Argued March 6, 2007—Decided June 27, 2007.

572

574

*David B. Glazer* argued the cause for appellant and cross-respondent (*Carl J. Herman* and *Glazer & Luciano, P.C.,* attorneys; *Mr. Glazer* and *Mr. Herman,* on the brief).

*Steven J. Kaflowitz,* Assistant Prosecutor, argued the cause for respondent and cross-appellant (*Theodore J. Romankow,* Union County Prosecutor, attorney).

*Frank Muroski,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Stuart Rabner,* Attorney General, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

In this appeal, we address the related issues of the standard to be applied in respect of the presentation of evidence before a grand jury and what remedy is appropriate in the event that standard is violated. During its initial presentation of a capital murder case to the grand jury, the prosecution subpoenaed four family members of defendant Alturik Francis and questioned them

concerning defendant's upbringing, history of substance abuse, history of violence, and psychological background, as well as the factual underpinnings of the crimes for which defendant eventually was charged. The State also questioned one of those family members—defendant's mother—about her discussions with a social worker employed by a mitigation firm retained to assist during the penalty phase of defendant's capital murder trial. At a grand jury proceeding almost a month later, the prosecutor instructed the grand jury to disregard that earlier testimony and to focus instead on the testimony presented that day by law enforcement officers. It was on that latter testimony that the grand jury returned an indictment against defendant.

Advocating the adoption of the dominant purpose test for all allegations of grand jury abuse, defendant asserts that the State overstepped proper boundaries when it questioned defendant's family members. Specifically, it is defendant's view that, in addition to using the grand jury for proper investigatory and charging purposes, the State misused the grand jury to secure evidence in respect of defendant's mitigation case; that such use of the grand jury violates the dominant purpose test; and that the appropriate remedy for that violation is the suppression—for all purposes—of any proofs secured in violation of the dominant purpose test. The State rejoins that the proper test to determine the propriety of a pre-indictment grand jury inquiry is whether the evidence procured is relevant to the grand jury's inquiry, and that all of the grand jury questioning was relevant.

We reject defendant's invitation to apply the dominant purpose test to pre-indictment grand jury proceedings. Instead, we hold that the standard to be applied to determine the proper scope of a grand jury's pre-indictment inquiry is whether the evidence sought is relevant to the grand jury's task; the dominant purpose test applies only to claims of post-indictment grand jury abuse.

I.

During the early morning of December 7, 2002, Majuly Collins, a thirty-two-year-old woman, her four-year-old son, and her eigh-

teen-month-old daughter were brutally murdered in their Elizabeth apartment. Collins was sexually assaulted and stabbed numerous times, and her children were suffocated. The police found the three bodies in the bathtub. Susan Vargas, Collins's twenty-one-year-old cousin who was living with her at the time, also was stabbed in the neck. Vargas, although seriously injured, survived the attack and told the police that a black male who lived in a downstairs apartment committed the rape and murders. The investigation quickly led the police to defendant, who lived in the downstairs apartment with his sister and his brother-in-law.

The police arrested defendant that same day. Over that day and the next, defendant made a total of four recorded statements to the police, each differing from its predecessor. In the first statement taken the morning of December 7, 2002, defendant told the police that he had participated in the robbery, but that his cousin, Jeffrey Corbit, also known as "Jahad," had committed the murders. Later that same day, defendant informed the police that he had committed all of the acts alone and that he had told them that Corbit was a participant in hopes of "get[ing] less time in jail." In the two statements taken the next day, defendant provided further incriminating details of the crimes.

As part of a grand jury proceeding convened on January 31, 2003 to investigate Collins's rape and murder, the murder of her two small children, and the assault on Vargas, the State subpoenaed four of defendant's family members to testify: defendant's stepfather, mother, sister, and brother-in-law. The State first explained to the grand jury that

[t]he first matter is the investigation regarding [defendant]. When I say investigation you're not going to be hearing evidence on this case at this point to determine whether or not to hand up an indictment. This is an investigative function of the Grand Jury where the purpose of this proceeding is to gather information by way of general background and I will keep it somewhat general because I anticipate that you will be hearing this case for presentation by the time your term is up.

After reciting a summary of the crimes under investigation and defining the inquiry then before the grand jury as designed "to

explain why [the crimes] happened or if there is any explanation or if there's no explanation[,]" the State emphasized that

[t]he basic question that is going to be asked of these [witnesses] is to find out backgrounds about [defendant], to get some kind of insight as to what happened on this day, if there was anything in his upbringing, his childhood, or in his young adult life, he was 23 years old, that would shed light as to why he may have committed these particular acts. And factually I will leave it at that, but that is going to be the essence of the questioning as if, "Tell us everything that you know about [defendant]."

Once it defined the scope of the inquiry then before the grand jury, and responding to a grand juror's question as their role in the process, the State laid out the procedure to be followed:

You're going to be able to ask questions yourself, and when I say investigative, you are the investigative body. You can ask any question that you want that is relevant. If there is a question that can't be asked for legal reasons I will tell you that and cut it off. If there's a question that's irrelevant, I will also tell you that, but if it's something that you as an investigative body, as a member of society want to know because you feel that it would be relevant to determining what happened and more importantly for these witnesses why it happened. That is your purpose and you can participate as much or as little as you see fit. Should this case come to you for consideration as to indictment, at that time I will be advising you as to what role today's proceedings play. I can't tell you at this point because I don't know what we're going to do here from the witness stand.

The first witness called before the grand jury was defendant's stepfather. He testified that, although defendant became enraged when drinking alcohol, he appeared psychologically stable; and that, in January 2003, sometime after defendant's arrest, he spoke with defendant, who confessed that he had participated in the crimes with his cousin, had stabbed Vargas, and had raped Collins.

The next witness to testify before the grand jury was defendant's mother, who was questioned concerning defendant's upbringing, in particular, his behavior at school; the reason the New Jersey Division of Youth and Family Services temporarily had taken defendant out of the home while at a young age; whether defendant was abused as a child; if defendant had any psychological problems or other emotional disturbances; if defendant had a history of drug or alcohol abuse; and if defendant had a history of violence. The State then asked defendant's mother if she had spoken with anyone else in respect of the case. When she

testified that she had spoken to a social worker but could not remember the social worker's name, she was asked whether the social worker was from "Alfonzo Associates" and she said "yes." Defendant's mother explained that the social worker told her that she "was employed by the lawyer who represent[ed defendant]." After exploring the conversation defendant's mother had with the social worker, and after several of the grand jurors asked questions directly of defendant's mother, she was excused. The prosecutor later explained to the grand jury that "[o]ne of the reasons I asked about Alfonzo Associates is there's a law firm that uses them to do a lot of their background. They ask the same questions that we are asking here. That's part of the understanding, trying to understand what happened that day."

The State then separately called defendant's sister and her husband to testify. Both witnesses were asked about defendant's actions on the night before and the morning after the murders; if defendant had a history of mental disturbances; if defendant had sought psychological counseling; or if defendant had a drug or alcohol problem.

Having completed its presentation of witnesses for the day, the State responded to several questions from the grand jurors and, because the grand jurors had started to concentrate on the details of the crimes, it summed up the proceedings as follows:

> There is a very strong likelihood that this Grand Jury is going to hear the case, so I don't want to get into any of those details. Even now, the comments that I'm making in response to your questions, and I don't believe that anything that I'm responding to at this point will impact down the road. And if it comes to the point where I think it may, then you won't hear this case. It's that simple.

Almost one month later, on February 26, 2003, the State returned to the grand jury to present its case against defendant. On that occasion, the State's proofs consisted of the testimony of two police officers, Detective Ismael Olivero and Detective Carl Riley, and twenty exhibits. The State introduced the task before the grand jury with the following cautionary note:

> [Y]ou may recall that there were some witnesses that were brought in on an investigative nature as it relates to this case. I'm instructing you that you should make your determination on this case as to the evidence that you hear today, that was another function that was going on at that time.

> You're going to be presented with the entire case today for your consideration. And your deliberations, your considerations, your votes, should be limited and based on the evidence that you hear today.... So your consideration is based on the evidence that you hear today.

When one of the grand jurors explained that he had been absent for the earlier presentation and asked if he could "hear the case[,]" the State explained: "Yes. The entire case is going to be presented today. So if you were not here the last time, you're in the same shoes as everyone else, because everyone else should disregard [the testimony presented on January 31, 2003]."

At the close of the State's presentation, the grand jury returned an indictment charging defendant with three counts of first-degree murder, in violation of *N.J.S.A.* 2C:11-3a(1) and (2); three counts of first-degree felony murder, in violation of *N.J.S.A.* 2C:11-3a(3); first-degree attempted murder of Susan Vargas, in violation of *N.J.S.A.* 2C:11-3a and 2C:5-1; second-degree burglary, in violation of *N.J.S.A.* 2C:18-2; first-degree robbery, in violation of *N.J.S.A.* 2C:15-1; first-degree aggravated sexual assault, in violation of *N.J.S.A.* 2C:14-2a(3) and (4); two counts of third-degree possession of a knife with a purpose to use it unlawfully against others, in violation of *N.J.S.A.* 2C:39-4d; and fourth-degree unlawful possession of a knife under circumstances not manifestly appropriate, in violation of *N.J.S.A.* 2C:39-5d.[1] On April 15, 2003, defendant filed two notices stating that he would assert the defenses of diminished capacity, *N.J.S.A.* 2C:4-2, and intoxication, *N.J.S.A.* 2C:2-8d.[2]

---

[1] As required by *N.J.S.A.* 2C:11-3c(2)(e), the State served on defendant a notice of aggravating factors in respect of all three murders, explaining that the State would seek the death penalty as to each murder. On June 17, 2005, as required by our intervening decision in *State v. Fortin*, 178 *N.J.* 540, 843 *A.2d* 974 (2004), the State presented to the grand jury, and the grand jury found aggravating factors c(4)(f) and (g) as to the murder of Collins, and aggravating factors c(4)(f), (g), and (k) in respect of the murder of Collins's children. *See N.J.S.A.* 2C:11-3c(4)(f), (g), and (k).

[2] In his brief in support of his motion for leave to appeal an interlocutory order, defendant explains that he also intends to raise an insanity defense

Defendant moved to dismiss the indictment. He alleged that the State's questioning of his family members before the grand jury was improper. Defendant also asserted that the trial court had the authority to fashion a proper remedy, be it dismissal of the prosecution; barring the State from seeking the death penalty; or suppressing the testimony of his family members and recusing the Union County Prosecutor's Office from prosecuting defendant. The State opposed defendant's application.

In a written decision, the trial court noted that defendant's "state of mind[,] which is an element of the crimes charged[,] is a proper area for grand jury inquiry." It explained that "[t]he question [ ] the grand jury must confront [i]s whether [ ] defendant possessed the mental capacity to perform acts knowingly or purposely." According to the trial court, "the grand jury must be able to make inquiry of information related to possible affirmative defense[s] such as intoxication or insanity." That said, the trial court reasoned that "[t]he clear purpose of the prosecutor's questions [of defendant's family members] was to obtain medical and psychological information about [ ] defendant that would not usually be available to the State until the penalty phase." Eschewing any applicable relevance analysis, the trial court concluded that "[t]here can be no doubt that the dominant purpose of the State in issuing subpoenas to defendant's family was to advance the discovery process related to a possible penalty phase of this case." It noted that "[t]he questions posed to [ ] defendant's relatives only tangentially related to his mental state at the time of the offense" and that "[t]he questioning of the witnesses regarding childhood behavior and prior crimes was an attempt to circumvent the restrictions of *Rule* 3:13–4 and obtain penalty mitigation evidence prior to trial."

---

pursuant to *N.J.S.A.* 2C:4–1. Although no notice to that effect has been made part of the record on appeal, the State, in its cross-motion for leave to appeal, represents that "while this appeal was pending, defendant filed a notice of insanity defense."

Once it concluded that there had been an abuse of the grand jury's function, the trial court addressed the remedy to be fashioned. In the trial court's view, defendant's requests "to dismiss the indictment, disqualify the Union County Prosecutor's Office or prohibit the State from seeking the death penalty are remedies which are not related to the improper use of the grand jury." Instead, the trial court ruled that "[t]he remedy for the State's transgression can easily be addressed by restricting the use of the information obtained." It barred the State "from utilizing the testimony of any of the witnesses before the January 31, 2003 grand jury in any proceeding in this case."

The State sought reconsideration or clarification of the trial court's ruling. Responding to that application, the trial court reaffirmed its reliance on the dominant purpose test in determining the propriety of the State's actions before the grand jury on January 31, 2003, and recognized a "defendant's right to protect mitigation information during the guilt phase of the proceedings." The trial court explained, however, that "the ruling of the court does not preclude the [S]tate from using at trial evidence of defendant's guilt[,]" noting that "testimony before the grand jury on January 31, 2003, which specifically relates to the issue of guilt, may be utilized by the [S]tate." Conversely, the trial court held that "to the extent [ ] the [S]tate obtained evidence regarding defendant's background relevant to mitigation issues, the [S]tate is precluded from the use of that information during the presentation of its case." The trial court did express one caveat applicable to that holding: "The possibility that the [S]tate may seek to use grand jury testimony for impeachment purposes does exist. The decision to allow or disallow such use of the testimony cannot be addressed in the abstract, but must be considered in the context of the trial." [3]

---

[3] Several months later, the trial court issued yet another clarification of its ruling, noting that it had "ruled that [the] testimony elicited by the prosecutor before the grand jury from defendant's family regarding mitigation factors is not admissible at the trial of this matter." It explained that "[s]uch use of the grand

The State moved for leave to appeal from that interlocutory ruling, which the Appellate Division granted. *State v. Francis,* 385 *N.J.Super.* 350, 897 *A.*2d 388 (App.Div.2006). Relying on a decision of the United States District Court for the Northern District of Illinois and an unreported summary order for the United States Court of Appeals for the Second Circuit, the panel adopted the dominant purpose test as the one applicable to grand jury proceedings, and concluded that "it is not proper to use a grand jury for the sole or dominant purpose of preparing a case for the penalty phase of a defendant's capital trial. Such use is violative of the 'dominant purpose' test and constitutes a misuse of the grand jury." *Id.* at 353, 897 *A.*2d 388. It held that "the 'dominant purpose' test was correctly utilized and applied by the trial judge in determining whether the [State] misused the pre-indictment grand jury by obtaining mitigation evidence to be used at the penalty phase of defendant's trial." *Ibid.* The panel, however, "modif[ied] the July 13, 2005 order to permit the [State] to use the grand jury record to impeach any family member's testimony or expert testimony based on family member's statements that are offered by defendant at the guilt phase of defendant's trial." *Ibid.* Adopting the distinction enunciated by the trial court, the Appellate Division also concluded that the State "may also utilize at trial any inculpatory statements made by defendant to a family member." *Ibid.* Defendant sought reconsideration of the Appellate Division's decision in respect of the permitted yet limited use of the January 31, 2003 grand jury material for impeachment purposes only; the panel denied that application.

We granted both defendant's motion for leave to appeal, 188 *N.J.* 344, 907 *A.*2d 1006 (2006), and the State's cross-motion, 188

---

jury is an impermissible intrusion into the defense's mitigation portion of the trial." It again limited the scope of its ruling, remarking that "evidence of the crime (e.g.[,] inculpatory statements alleged to have been made by defendant to a family member) is not barred by this ruling."

*N.J.* 570, 911 *A.*2d 64 (2006). We also granted the Attorney General leave to appear amicus curiae.

## II.

In his appeal, defendant attacks the limits of the remedy set forth by the Appellate Division, arguing that the panel erred in allowing the impeachment use of the otherwise barred January 31, 2003 grand jury testimony. According to defendant, because defendant intends to rely on an insanity defense, the remedy fashioned by the Appellate Division allows the State "to cross examine the defense [psychiatrist] utilizing the testimony obtained through prosecutorial misconduct." In defendant's view, because "the same jury [that] will hear the guilt/innocence phase in the case [also] will decide the death penalty issue, in all likelihood the jury will be exposed to the very evidence the Appellate Division has carefully attempted to exclude." Defendant concludes that "the remedy imposed by the Appellate Division will render the remainder of the opinion ineffective and will permit the use of testimony obtained through prosecutorial misconduct at defendant's trial."

The State challenges the fundamental analysis adopted by both the trial court and the Appellate Division. Distinguishing between pre- and post-indictment grand jury proceedings, the State argues that "the Appellate Division has opened the door to applying the 'dominant purpose' test to pre-indictment grand[ ] jury proceedings[.]" Hewing to its view that the evidence adduced before the grand jury on January 31, 2003 was relevant, the State argues that "[s]imply because evidence is expendable for the purpose of determining probable cause to indict does not mean that such evidence is not relevant to the question of guilt."

Amicus, the Attorney General of New Jersey, argues that it is error to apply the dominant purpose test to any pre-indictment grand jury proceedings. Advancing the adoption of a bright-line test, the Attorney General argues that the proper test for the propriety of pre-indictment grand jury proceedings is whether the

evidence sought was relevant to the grand jury's inquiry, and that the dominant purpose test is to be applied only when gauging the propriety of post-indictment grand jury proceedings. The Attorney General also argues that, even if the dominant purpose test were to apply in pre-indictment grand jury matters, that test too is satisfied here. In the Attorney General's interpretation, the dominant purpose of the State's efforts here were squarely focused on whether probable cause existed to believe that defendant committed the crimes for which he stands charged, and a core function in that analysis is determining defendant's state of mind. For that reason, the Attorney General urges that we adopt its proposed bright-line test and apply a standard of relevance to these pre-indictment grand jury proceedings, or, in the alternative, hold that the State's actions here satisfied the dominant purpose test.

Analytically, we address first the standard of review to be applied in determining whether there has been an abuse of the grand jury process. We then turn to a discussion of the appropriate remedy in the event an abuse of the grand jury process is found on application of the appropriate standard.

### III.

New Jersey's Constitution explicitly guarantees the right to indictment by a grand jury. *N.J. Const.* art. I, ¶ 8 (stating that "[n]o person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury"). Traditionally viewed as a shield between an individual and his sovereign, *In re The Grand Jury Appearance Request by Loigman*, 183 *N.J.* 133, 138, 870 *A*.2d 249 (2005) (explaining that, historically, grand jury "stand[s] between the defendant and the power of the State" (internal quotations omitted)), "[t]he grand jury is a judicial, investigative body," with "broad investigative authority ... to determine whether a crime has been committed and whether criminal investigations should be instituted against any person." *Id.* at 141, 870 *A*.2d 249 (internal citations and quotations omitted);

see also *State v. McAllister*, 184 *N.J.* 17, 36, 875 *A.*2d 866 (2005) (holding that " 'the grand jury remains a constitutional bulwark against hasty and ill-founded prosecutions and continues to lend legitimacy to our system of justice by infusing it with a democratic ethos' " (quoting *State v. Fortin*, 178 *N.J.* 540, 638, 843 *A.*2d 974 (2004))). Thus, the grand jury's core purpose is to "determine whether the State has established a *prima facie* case that a crime has been committed and that the accused has committed it," and it stands as "the primary security to the innocent against hasty, malicious and oppressive persecution," *State v. Hogan*, 144 *N.J.* 216, 227–28, 676 *A.*2d 533 (1996) (internal quotations omitted).

▇▇▇▇ To carry out its investigatory role, the grand jury is entrusted with expansive powers. *Branzburg v. Hayes*, 408 *U.S.* 665, 688, 92 *S.Ct.* 2646, 2660, 33 *L.Ed.*2d 626, 643 (1972); *see also United States v. Dionisio*, 410 *U.S.* 1, 13, 93 *S.Ct.* 764, 771, 35 *L.Ed.*2d 67, 79 (1973). Those powers are necessary because "a grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *Dionisio, supra*, 410 *U.S.* at 13, 93 *S.Ct.* at 771, 35 *L.Ed.*2d at 79 (citations, internal quotation marks, and editing marks omitted). If the grand jury "is even to approach the proper performance of its constitutional mission, it must be free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it." *Id.* at 17–18, 93 *S.Ct.* at 773, 35 *L.Ed.*2d at 81.

▇▇▇▇ Grand jury proceedings are largely controlled by prosecutors, who are charged to use "all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." *N.J.S.A.* 2A:158–5; *In re Loigman, supra*, 183 *N.J.* at 144, 870 *A.*2d 249 (explaining that obligation "to bring before the grand jury meritorious complaints of potential criminal conduct and to weed out frivolous allegations unworthy of presentation" is "a function our court rules already entrust to [prosecutors]"). Given the grand jury's unique status in our system of

justice, we have underscored that "[a] prosecutor is enjoined from using improper methods calculated to produce a wrongful conviction.... Those principles of fairness are particularly important in a grand jury setting in which the prosecutor questions witnesses, introduces evidence, and explains the law to the jurors without a judge or defense attorney in attendance." *Id.* at 144–45, 870 *A.*2d 249 (citations and internal quotation marks omitted). While performing those functions, the prosecutor cannot impinge on a grand jury's independence and improperly influence its determination. *Hogan, supra,* 144 *N.J.* at 229, 676 *A.*2d 533; *State v. Hart,* 139 *N.J.Super.* 565, 569, 354 *A.*2d 679 (App.Div.1976). Within those bounds, "there is no impropriety in the prosecutor assisting in the investigation and examination of witnesses; in advising the grand jury as to the admissibility of evidence and the proper mode of procedure and in explaining the testimony with reference to the law of the case." *Hart, supra,* 139 *N.J.Super.* at 567, 354 *A.*2d 679.

■ With those principles guiding our analysis, we turn to the task of defining the standard of review to be applied in determining whether there has been an abuse of the grand jury process. In that task, we acknowledge that because grand jury proceedings are entitled to a presumption of validity, *State v. Engel,* 249 *N.J.Super.* 336, 359, 592 *A.*2d 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991) (citing *State v. N.J. Trade Waste Ass'n,* 96 *N.J.* 8, 18–19, 472 *A.*2d 1050 (1984)), defendant bears the burden of proving that the prosecutor misused the grand jury for an improper purpose. *See In re Addonizio,* 53 *N.J.* 107, 126, 248 *A.*2d 531 (1968) ("We repeat that the authority of a grand jury to make a criminal investigation need not be shown, and that he who asserts an abuse must prove it.").

### A.

■ Defendant asserts that his mitigation evidence is protected by the *Rules Governing the Courts of the State of New Jersey* and, hence, the State's attempt to discover that evidence before defen-

dant's obligation of disclosure ripened somehow violates defendant's rights. In support of that claim, defendant relies on *Rule* 3:13–4(b), which defendant asserts protects his mitigation evidence from premature disclosure. From that premise, defendant contends that the State's efforts to secure mitigation proofs pre-indictment violated defendant's asserted right and that such violation demands a strict remedy.

We disagree. By its plain language, *Rule* 3:13–4 does not enumerate rights. On the contrary, it imposes specific and mandatory disclosure obligations on both the State and the defense. Thus, *Rule* 3:13–4(a) requires that the State provide the defense a list of the aggravating factors on which the State intends to rely to seek the imposition of the death penalty, "together with all discovery bearing on these factors [and] any discovery in the possession of the prosecution that is relevant to the existence of any mitigating factors." *Rule* 3:13–4(b), on which defendant relies, places a corresponding obligation of disclosure on defendant. It requires that, in a capital case, "[t]he defendant shall provide the prosecuting attorney with an itemization setting forth the mitigating factors the defendant intends to rely on at the sentencing hearing together with any discovery in the possession of the defendant in support of those factors." *R.* 3:13–4(b). The *Rule* also provides that "[s]uch discovery shall be transmitted to the prosecuting attorney forthwith upon a verdict of guilty, or plea of guilty, to a crime punishable by death." *Ibid.*

Given the clear, express language of the *Rule,* we fail to see how, standing alone, efforts by the State to secure in advance information defendant eventually will be duty-bound to disclose to the State in some wise amounts to improper conduct. We therefore reject defendant's reading of *Rule* 3:13–4(b) in favor of its plain meaning: it imposes a duty of disclosure, and not a right of concealment.

That conclusion, however, does not end our inquiry. Even if the State was entitled to secure, through its own devices, information concerning defendant's mitigation claims, the fundamental question in this case remains. That is, whether the State's use of the

grand jury as the means to secure that information was in and of itself proper. In order to answer that inquiry, we must first define the context in which the State uses the grand jury—whether pre- or post-indictment—in order to address the standard to be applied. It is to that task that we now turn.

## B.

■■■ Nationally, courts have distinguished between pre- and post-indictment grand jury proceedings in determining what standard is to be applied for grand jury abuse claims. In respect of the latter, the universal view is that the use of the grand jury *after* an indictment has been returned will be gauged by the application of the dominant purpose test.[4] *See, e.g., United States v. Moss,* 756 *F.*2d 329, 332 (4th Cir.1985) (holding that prosecutor "cannot

---

[4] Federal courts apply the dominant purpose test to post-indictment grand jury proceedings. *See, e.g., United States v. Bros. Constr. Co.,* 219 *F.*3d 300, 314 (4th Cir.), *cert. denied,* 531 *U.S.* 1037, 121 *S.Ct.* 628, 148 *L.Ed.*2d 537 (2000); *United States v. Salameh,* 152 *F.*3d 88, 109 (2d Cir.1998), *cert. denied,* 526 *U.S.* 1028, 119 *S.Ct.* 1273, 143 *L.Ed.*2d 368 (1999); *United States v. Alred,* 144 *F.*3d 1405, 1413 (11th Cir.1998); *United States v. Leung,* 40 *F.*3d 577, 581 (2d Cir.1994); *United States v. Rugiero,* 20 *F.*3d 1387, 1395 (6th Cir.), *cert. denied,* 513 *U.S.* 878, 115 *S.Ct.* 208, 130 *L.Ed.*2d 137 (1994); *United States v. Badger,* 983 *F.*2d 1443, 1458 (7th Cir.), *cert. denied,* 508 *U.S.* 928, 113 *S.Ct.* 2391, 124 *L.Ed.*2d 293 (1993); *United States v. Moss,* 756 *F.*2d 329, 332 (4th Cir.1985); *(U.S. v. Under Seal),* 714 *F.*2d 347, 350 (4th Cir.), *cert. dismissed,* 464 *U.S.* 978, 104 *S.Ct.* 1019, 78 *L.Ed.*2d 354 (1983); *In re Grand Jury Proceedings (Johanson),* 632 *F.*2d 1033, 1041 (3d Cir.1980); *United States v. Gibbons,* 607 *F.*2d 1320, 1328 (10th Cir.1979); *United States v. Zarattini,* 552 *F.*2d 753, 756 (7th Cir.), *cert. denied,* 431 *U.S.* 942, 97 *S.Ct.* 2661, 53 *L.Ed.*2d 262 (1977); *United States v. Sellaro,* 514 *F.*2d 114, 121–22 (8th Cir.1973), *cert. denied,* 421 *U.S.* 1013, 95 *S.Ct.* 2419, 44 *L.Ed.*2d 681 (1975); *United States v. George,* 444 *F.*2d 310, 314 (6th Cir.1971); *United States v. Dardi,* 330 *F.*2d 316, 336 (2d Cir.1964); *United States v. Furrow,* 125 *F.Supp.*2d 1170, 1172–73 (C.D.Cal.2000); *United States v. Bissell,* 954 *F.Supp.* 841, 877 (D.N.J.1996), *aff'd o.b.,* 142 *F.*3d 429 (3d Cir.1998).

State courts likewise apply the dominant purpose test only in respect of post-indictment grand jury proceedings. *See, e.g.,* Florida—*Agrella v. Rivkind,* 404 *So.*2d 1113, 1114 (Fla.Dist.Ct.App.1981); Illinois—*Illinois v. DeLaire,* 240 *Ill. App.*3d 1012, 183 *Ill.Dec.* 33, 610 *N.E.*2d 1277, 1288, *appeal denied,* 151 *Ill.*2d 569, 186 *Ill.Dec.* 387, 616 *N.E.*2d 340 (1993); Kentucky—*Bishop v. Caudill,* 87 *S.W.*3d 1, 2 (Ky.2002); Maryland—*Erman v. Maryland,* 49 *Md.App.* 605, 434

utilize the grand jury solely or even primarily for the purpose of gathering evidence in pending litigation[,]" and explaining that "the sole or dominant purpose test is necessary to prevent any undue intrusion into the investigatory power of the grand jury"). In short, the rationale of the "dominant purpose" standard is that the use of the grand jury for discovery purposes cannot be countenanced. *Ibid.* The United States Court of Appeals for the Third Circuit has stated the governing proposition in unequivocal terms: "It is a firmly entrenched rule that *once a defendant has been indicted,* a prosecutor may not use a grand jury's investigatory powers for the purpose of securing additional evidence against the defendant for use in the upcoming trial." *In re Grand Jury Proceedings (Johanson), supra,* 632 *F.*2d at 1041 (emphasis supplied; internal citations omitted). That rule of law has been comprehensively expressed as follows:

> The investigative power of a grand jury does not necessarily end with the return of an indictment. Rather, a grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined. However, use of the grand jury as a means for criminal discovery is prohibited.

> Once a defendant has been indicted the government is precluded from using the grand jury for the "sole or dominant purpose" of obtaining additional evidence against him.

> The "dominating purpose" test presupposes that the government can have more than one purpose in calling a witness before the grand jury. For example, the government may properly use the grand jury to identify or investigate other individuals involved in criminal schemes, or to prepare superseding indictments against persons already charged. The grand jury also may inquire into possible affirmative defenses and the like in order to determine whether a prosecution should proceed.

> Proof that the government derived an incidental benefit at trial from the disputed grand jury testimony is insufficient to establish that prosecutors have abused the grand jury.

> The law presumes, absent a showing to the contrary, that a grand jury acts within the legitimate scope of its authority. Accordingly, [d]efendant bears the burden of demonstrating that an abuse has occurred.

A.2d 1030, 1044 (Md.1981), *cert. denied sub nom., Brent v. Maryland,* 456 *U.S.* 908, 102 *S.Ct.* 1756, 72 *L.Ed.*2d 165 (1982); New York—*Hynes v. Lerner,* 44 *N.Y.*2d 329, 405 *N.Y.S.*2d 649, 376 *N.E.*2d 1294, 1296, *cert. denied,* 439 *U.S.* 888, 99 *S.Ct.* 243, 58 *L.Ed.*2d 234 (1978); Pennsylvania—*Pennsylvania v. Melson,* 383 *Pa.Super.* 139, 556 *A.*2d 836, 839 (1989), *appeal denied,* 525 *Pa.* 579, 575 *A.*2d 111 (Pa.1990).

[*United States v. Furrow,* 125 *F.Supp.*2d 1170, 1172–73 (D.Cal.2000) (citations, internal quotation marks, editing marks, and footnotes omitted).]

In contrast, a different analysis obtains when the question at issue is the use of the grand jury process *before* an indictment has been returned. We have "stress[ed] the need for broad power in ... the grand jury to probe widely for evidence of crime." *In re Addonizio, supra,* 53 *N.J.* at 134, 248 *A.*2d 531. We also have explained that "[t]he court may not hamstring a prosecuting official in his marshalling of evidence before a grand jury on any fine-spun distinctions between what evidence is sufficient to return a valid indictment and what is necessary to convict." *In re Petition to Compel Testimony of Tuso,* 73 *N.J.* 575, 580, 376 *A.*2d 895 (1977). Our distillation of those fundamental concepts leads to the conclusion that the standard applicable to claims of pre-indictment grand jury abuse must be whether the evidence sought by the State via the grand jury was relevant to the crimes under investigation, that is, did the evidence sought have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401; *see State v. Williams,* 190 *N.J.* 114, 122–23, 919 *A.*2d 90 (2007) (explaining that "[r]elevant evidence is defined as any evidence that has a tendency in reason to prove or disprove any fact of consequence to the determination of the action[,]" that "[i]n relevance determinations, the analysis focuses on the logical connection between the proffered evidence and a fact in issue[,]" and that "[t]he standard for the requisite connection is generous: if the evidence makes a desired inference more probable than it would be if the evidence were not admitted, then the required logical connection has been satisfied" (citations and internal quotation marks omitted)).

For those reasons, we recognize that, based on whether the State's challenged use of the grand jury occurred pre- or post-indictment, different rules apply in respect of grand jury abuse claims. In the pre-indictment setting, the inquiry must focus on whether the evidence the State sought was relevant to the crimes under investigation. If the claims of grand jury abuse arise in

respect of the use of the grand jury *after* an indictment has been returned, we join the unbroken line of authority that holds that such use of the grand jury is permitted unless the dominant purpose of that use was to buttress an indictment already returned by the grand jury. Post-indictment, the State may continue to use the grand jury to investigate additional or new charges against a defendant. However, once an indictment is returned, the State may not use the grand jury to gather evidence solely in respect of the charges already filed.

## C.

 It is conceded that, in this instance, the State's challenged use of the grand jury occurred *before* the indictment against defendant was returned. Relying on *United States v. Phillips,* 577 *F.Supp.* 879 (N.D.Ill.1984), and *United States v. Fulton,* 1997 U.S.App. LEXIS 654 (2d Cir.1997), the Appellate Division nevertheless applied the dominant purpose test to such pre-indictment use of the grand jury, and ultimately concluded that using the "grand jury for the sole or dominant purpose of preparing a case for the penalty phase of a defendant's capital trial ... is violative of the 'dominant purpose' test and constitutes a misuse of the grand jury." *Francis, supra,* 385 *N.J.Super.* at 353, 897 *A.*2d 388. Because the Appellate Division applied an incorrect standard of review—the dominant purpose test instead of relevance—we are compelled to disagree.[5]

The State's challenged use of the grand jury occurred almost one month before the State presented its case for an indictment to

---

[5] The two federal authorities on which the Appellate Division relied to engraft the dominant purpose test on these pre-indictment circumstances do not support that proposition. For example, in *Phillips, supra,* the court recognized the conflicting considerations that "the government may not utilize a grand jury for the sole or primary purpose of gathering evidence for use in a pending trial" but that "the government has every right to continue a grand jury investigation, even when the evidence received may also relate to a pending indictment." 577 *F.Supp.* at 880 (citations omitted). In any event, *Phillips* involved an instance when the challenged evidence was received by the government in response to a

the grand jury. Applying the standard applicable to the State's use of the grand jury in a pre-indictment setting, the propriety of those acts must be viewed through the prism of relevance, not whether the State's dominant purpose in securing the challenged evidence was to support an already returned indictment. The application of that standard also informs that the presumptive bar of the January 31, 2003 grand jury testimony from the guilt phase of defendant's trial, as urged by defendant, cannot be sustained.

### D.

██ Once the proper standard of review of any pre-indictment claims of grand jury abuse has been defined as whether the

---

grand jury subpoena *before* the grand jury returned its indictment. For that reason, the defendant in *Phillips* claimed that "[b]ecause the government obtained the [evidence] only hours before the grand jury returned its indictment of [defendant], ... the government could not have intended that the records actually be considered by the grand jury" and, hence, "the government's dominant purpose in obtaining the [evidence] must be to prepare for the pending trial of [defendant], an improper use of the grand jury's broad investigatory powers." *Ibid.* As the Appellate Division acknowledged, the *Phillips* court did not apply the dominant purpose test. Instead, as the panel noted, the *Phillips* "court determined that the [evidence] w[as] *relevant* to the grand jury's continuing investigation, and thus there was no abuse of the grand jury process." *Francis, supra,* 385 *N.J.Super.* at 362, 897 A.2d 388 (emphasis supplied). Therefore, although the defendant in *Phillips* advocated the application of the dominant purpose test, that claim was rejected in favor of ordinary relevance principles.

Similarly, in *Fulton, supra,* the United States Court of Appeals for the Second Circuit, in an unpublished summary order, held that the defendant's "contention that the government improperly subpoenaed two grand jury witnesses in order to prepare for his trial is without factual merit." 1997 U.S.App. LEXIS 654 at *3. The court explained that "[o]ne of those witnesses was subpoenaed prior to the return of the indictment against [defendant]; the other provided testimony in connection with an ongoing investigation of other matters relating to [defendant]." *Id.* at *3–*4. Thus, although the *Fulton* court spoke in terms of "see[ing] no error in the court's finding that neither witness was subpoenaed for the sole or dominant purpose of trial preparation in the present matter[,]" *id.* at *4, it is obvious that the court considered both challenged witnesses under a relevance standard and, in the final analysis, refused to bar the testimony of either.

evidence sought is relevant, and after concluding that the relevance standard governs defendant's specific claims of grand jury abuse in respect of the January 31, 2003 grand jury proceedings, we must nevertheless apply that standard to the information elicited by the State from defendant's family members before the grand jury, determine whether those proofs were relevant, and, if not, ascertain what remedy is appropriate.

At first blush, it appears that at least some of the testimony elicited by the State from defendant's family members on January 31, 2003 was, in fact, relevant. For example, testimony concerning defendant's psychological background could be relevant to the charges ultimately returned against defendant, as it may have a "tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. However, the testimony elicited from defendant's mother in respect of her discussions with a social worker employed by a mitigation firm retain to assist in defendant's defense may not be relevant to the charges brought against defendant. In lieu of exercising our original jurisdiction and determining those questions here, *see R.* 2:10–5, the better practice lies in a remand to the trial court for a determination of those relevance issues.

On remand, the trial court may determine that some of the testimony of defendant's family members was not relevant to the charges against defendant. If so, the remedy for instances where the State has improperly used the grand jury process in gathering proofs it seeks to use at trial is suppression of the improperly garnered proofs.

That said, the exclusion of irrelevant evidence procured through the grand jury process does not perforce imply that the evidence is forever lost to the State. As with suppressed statements, irrelevant evidence elicited in the grand jury nonetheless can be used for impeachment purposes. *State v. Burris,* 145 *N.J.* 509, 524, 679 *A.*2d 121 (1996) (concluding that "New Jersey has also adopted and employed the impeachment exception[,]" and explaining that "impeachment exception is accepted in nearly

every state in America and has been found to extend to violations of constitutional rights as well as violations of *Miranda's* prophylactic rules"). Allowing the use as impeachment of barred grand jury evidence is founded on the precept that its " 'inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence....' " *Id.* at 523, 679 *A.*2d 121 (quoting *Oregon v. Hass,* 420 *U.S.* 714, 723, 95 *S.Ct.* 1215, 1223, 43 *L.Ed.*2d 570, 578 (1975)). A special note of caution applies if the irrelevant evidence consists of statements: "The impeachment exception is strictly limited to situations in which the suppressed statement is trustworthy and reliable in that it was given freely and voluntarily without compelling influences." *Id.* at 525, 679 *A.*2d 121. Stated differently, if a suppressed statement is not otherwise trustworthy and reliable, it cannot be used for impeachment purposes at trial. Those considerations in the aggregate must inform the trial court's determinations on remand.

## IV.

The judgment of the Appellate Division is reversed and the cause is remanded to the Law Division for further proceedings consistent with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—6.

*Opposed*—None.