# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1719-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MICHAEL D. OLIVER, a/k/a
MICHAEL DAY, and
WAYNE FRENCH,

    Defendant-Appellant.

_____

Argued October 23, 2018 – Decided November 2, 2018

Before Judges Fisher and Firko.

On appeal from Superior Court of New Jersey, Law Division, Salem County, Indictment No. 15-05-0277.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Marcia H. Blum, of counsel and on the briefs).

Adam D. Klein, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Adam D. Klein, of counsel and on the brief).

PER CURIAM

Defendant Michael D. Oliver was originally indicted in Salem County for murder, N.J.S.A. 2C:11-3; aggravated manslaughter, N.J.S.A. 2C:11-4(a); endangering the welfare of children, N.J.S.A. 2C:24-4(a); and aggravated assault, N.J.S.A. 2C:12-1(b)(1) by a grand jury. He entered a conditional guilty plea to first-degree aggravated manslaughter, in violation of N.J.S.A. 2C:11-4(a)(2). Pursuant to the plea agreement, he was sentenced to a twenty-year term of imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Judge Benjamin C. Telsey also imposed a five-year period of post-release parole supervision, requisite fines, and penalties. Defendant raises the following points for our consideration on appeal:

> POINT I
>
> THE INDICTMENT FOR SERIOUS[]BODILY[] INJURY MURDER MUST BE DISMISSED BECAUSE: 1) THE PROSECUTOR GAVE THE JURY AN INCORRECT DEFINITION OF THE ESSENTIAL ELEMENT OF SERIOUS BODILY INJURY AND 2) THE STATE FAILED TO PRESENT PRIMA FACIE EVIDENCE THAT DEFENDANT COMMITTED SERIOUS[]BODILY[]INJURY MURDER.
>
> 1. Incorrect definition of serious bodily injury murder.
>
> 2. Failure to present prima facie evidence of SBI murder.

POINT II

DEFENDANT'S STATEMENT MUST BE SUPPRESSED BECAUSE THE MIRANDA FORM THE POLICE USED TO ADVISE HIM OF HIS RIGHTS WAS INACCURATE AND MISLEADING AND PRECLUDED A KNOWING, VOLUNTARY, AND INTELLIGENT WAIVER OF HIS CONSTITUTIONAL RIGHTS.

We have considered these arguments in light of the record and applicable legal standards and affirm.

I.

The following facts are derived from the record. Defendant was babysitting the victim, four-year old L.P.,[1] and three other children, in December 2014 in Penns Grove. After finding L.P. unresponsive and being unable to contact her mother, defendant called 911 for an ambulance. The dispatcher asked him several questions, including, "how old is she?", "what's going on?", and "what happened?" Defendant responded that he did not have "time to answer all of that" and was instructed by the dispatcher to perform cardiopulmonary resuscitation (CPR), which he attempted until the paramedics and police arrived. After L.P. was transported to the hospital, Detective James

---

[1] We use initials to protect the identities of the victim and juveniles involved in these proceedings. R. 1:38-3(d).

A-1719-16T4

Gillespie of the Salem County Prosecutor's Office went to the apartment and questioned defendant about what happened. Gillespie recorded the conversation on his cell phone because defendant was "talking to me very fast, providing . . . a lot of information at once." Miranda[2] warnings were not given because Gillespie did not consider defendant a suspect at that point in time since information was being gathered. According to defendant, while he and two of the children were cleaning the apartment, L.P. was in a bedroom with M.D. He heard a "thump," but "didn't pay no mind" because he thought they were playing. When he entered the room, he saw L.P. lying on the floor and told her to "stop playing" and "get the fuck up" or he would make her "assume the position, or put [her] on the floor." He picked up her limp body and carried her to the living room. Defendant claimed he was "trying to get this little fucker to breathe" and "thought she was dead."

At 11:00 p.m. that evening, Gillespie drove defendant to the police station where he was read his Miranda rights and signed a Miranda card advising him of his rights even though he was not then considered a suspect. Prior to the interview, the child died. Defendant provided a more detailed account to the detectives about what happened that day and he described his relationship with

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1719-16T4

the children.  He described how he "normally just beat up the kids" in order to play with them.  On the day in question, the children were jumping on the bed and "got a little too rowdy" so he put them to bed.  He stated L.P., who was "spoiled" and a "bully", was on the floor, and he thought she was "playing possum."  Her eyes were open.  He shouted, "All right, stop fucking playing. Get up, it's time for bed."

Without provocation, defendant claimed during this interview that he was anxious about a prior incident that occurred in Camden years ago with his former girlfriend as to who was going to babysit a child.  Because he thought "probation or something like that" would be imposed, defendant said, "Fuck it, I did it," and he served five years in prison for that crime.  Before ending the interview, defendant asked Gillespie about L.P. but was not informed of her demise.

The same day, Gillespie spoke to one of the children, five-year old N.D., who described how defendant punished the children when they misbehaved. With regard to L.P., defendant would make her "be on the floor and put her feet up" six inches from the ground.  N.D. further said L.P. "was bad" because she kicked defendant.  When she was unable to maintain her feet six inches above the floor, defendant punched her nine times in her lower abdomen while she cried, as re-enacted by N.D., who also stated that L.P. cried throughout.

5

The medical examiner, Dr. Gerald Feigin, conducted an autopsy of L.P. the next day and determined that she died as a result of "blunt force trauma to the abdomen," and that the manner of her death was homicide. That same day, defendant was arrested, handcuffed, and transported to the police station. Before reading defendant his Miranda rights, Gillespie told him, "Now, same thing as yesterday; . . . before I talk to you about anything, I've just got to go through this here with you. I just have to read you your rights; all right?" His Miranda rights were explained to him and defendant responded "yes" when asked if he understood them. Gillespie and Sergeant Elliot Hernandez asked defendant to recount the previous night's events. He did so and claimed he did not punch or "play fight" with the children that night. He did not deny being the only adult present. After initially protesting, defendant also retold the story about the previous child neglect arrest. L.P.'s autopsy results were shared with defendant, who could not offer an explanation as to the bruises found on her back. His response was, "I'm telling you, I don't know nothing about no bruises," and admitted that a bruise occurs by "somebody hitting you." Defendant became agitated and said, "it's going to go back to me going to jail," and requested counsel. He was charged with murder.

A-1719-16T4

At the plea hearing, defendant admitted that he acted recklessly and with an extreme indifference to the value of human life.

II.

We review arguments raised for the first time on appeal under a plain error standard. Under this standard, we disregard an error unless it was "clearly capable of producing an unjust result." R. 2:10-2; State v. Daniels, 182 N.J. 80, 95 (2004); State v. Macon, 57 N.J. 325, 337 (1971). One of the reasons that we deal differently with claims of error, which could have but were not raised at trial, from those timely challenged is because "[i]t may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." Macon, 57 N.J. at 333.

In preserving his right to appeal the denial of the motion to dismiss the indictment, defendant contends that the State did not present evidence of a knowing or purposeful state of mind to the grand jury. Now on appeal, for the first time, he argues "serious bodily injury" was not correctly defined by the State to the grand jury, and that the "purposely and knowingly" element of murder was based upon N.D.'s statement to the police, which is insufficient.

Subject to certain exceptions not applicable here, criminal homicide constitutes murder when the defendant "purposely" or "knowingly" causes the

death of the victim or commits serious bodily injury that results in death. See

N.J.S.A. 2C:11-3(a)(1) (regarding purposeful conduct), -3(a)(2) (regarding

knowing conduct); State v. Cruz, 163 N.J. 403, 417-18 (2000); see also State v.

Galicia, 210 N.J. 364, 377-78 (2012). He essentially maintains that no

reasonable fact-finder could have concluded that he possessed the mens rea to

commit murder. We disagree.

The grand jury was read relevant portions of the indictment, as well as the

definitions for knowing or purposeful serious bodily injury murder. Prior to

eliciting testimony, the assistant prosecutor read the following relevant portion

of the indictment to the grand jury:

> The Grand Jurors of the State of New Jersey for the County of Salem, upon their oaths, indicate that on December 3, 2014, in Penns Grove, Salem County, [defendant] purposely or knowingly did inflict serious bodily injury upon [the child victim] which resulted in the death of [the child victim], contrary to 2C:11-3(a)(2).

The elements of knowing or purposeful serious bodily injury murder were

read to the grand jurors as follows:

> Now I will read for you the mental intents that are found in 2C:2-2, which are referenced in 2C:11-3. Purposely, let me just make a notation here, is defined, "a person acts purposely with respect to the nature of his conduct or a result thereof, it is – if it is his conscious objection or object to engage in conduct of that nature, or to cause

such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances, or he believes or hopes that they exist. With purpose, designed, with design or equivalent terms have the same meaning.["]

Knowingly, a person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result, knowing, with knowledge or equivalent terms have the same meaning.

The assistant prosecutor also defined serious bodily injury for the grand jury by stating, "[s]erious bodily injury is defined under 2C:11-1[, as] '[b]odily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.'"

The grand jury heard testimony from Gillespie that defendant was the only adult home with four children; he made L.P. lay down on the floor with her ankles raised and punched her "hard" nine times in her lower abdomen; and that the autopsy report concluded that the cause of death was blunt force abdominal trauma. Gillespie further testified that the manner of death was homicide.

A-1719-16T4

We are mindful of the State's persuasive argument here that defendant's serious bodily injury contention was not encompassed by his conditional guilty plea. Nonetheless, we still reject defendant's argument. Our standard of review in examining the trial court's denial of a motion to dismiss the indictment is limited, and will be reversed only for an abuse of discretion. State v. Saavedra, 222 N.J. 39, 55-56 (2015). An indictment should be dismissed "only on the clearest and plainest ground; and only when the indictment is manifestly deficient or palpably defective." State v. Twiggs, 233 N.J. 513, 531-32 (2018). Grand jury proceedings are presumed valid, and defendant has the burden to prove prosecutorial error. State v. Francis, 191 N.J. 571, 586 (2007); see also State v. Triestman, 416 N.J. Super. 195, 204 (App. Div. 2017). The grand jury is simply an accusatory body and determines probable cause, or a prima facie case. State v. Hogan, 144 N.J. 216, 235 (1996).

In denying the motion to dismiss the indictment, Judge Telsey aptly found:

> That is a fact issue; and, the [c]ourt has to at least look at what was presented to the jury, the [g]rand [j]ury that is, to see if there's at least a prima facie showing of facts for the jury to draw that conclusion.

> When I look at the allegations that were presented to the jury in this particular case, the defendant gave a statement or reaction to the victim being found unresponsive on the bedroom floor, was, "I'm going to

fuck you up, or make you assume the position, or put you on the floor. Shit like that."

The State provided the defendant's reaction to police questioning, where the defendant indicated that he agreed with detectives that the victim was [], "spoiled and a brat."

Further, N.A. indicated that the defendant would punish the children by - - he'd babysit, by making them lay on the floor, with their feet up in the air. When the child's feet fell to the ground, the defendant would punch the child in the stomach, hard sometimes, making the children cry.

Based upon the evidence alone, there appears to be prima facie evidence as to the mental state of the defendant; and, it would be up for the [g]rand [j]ury in this particular case, to make a determination as to whether or not the State has met its - - has established probable cause of knowing or purposeful.

And [the jury] will be instructed . . . at the time of trial, [and] they'll have to decide, beyond a reasonable doubt, where[]as the [g]rand [j]ury only has to decide . . . whether or not there is probable cause, . . . and, I'm reading from the charge[:]

"The nature of the purpose or knowledge with which the defendant acted toward the victim, is a question of fact for you, the jury, to decide. Purpose and knowledge are conditions of the mind, which cannot be seen, and can only be determined by inferences from conduct, words, or acts.["]

"It is not necessary for the State to produce a witness, or witnesses, who could testify that the defendant stated, for example, that his purpose was to cause death

11

or serious bodily injury resulting in death, or that he knew that his conduct would cause death or serious bodily injury resulting in death.["]

"It is within your power to find that proof of purpose or knowledge has been furnished," here, beyond a reasonable doubt, which doesn't apply to the [g]rand [jury]. "By inferences which may arise from the nature of the acts and the surrounding circumstances.["]

"Such things, as the place where the acts occurred, the weapon used, if any, the location, number and nature of wounds inflicted; and, all that was done or said by the defendant pr[e]ceeding, connected with, and immediately succeeding the events leading to the death of the victim, are among the circumstances to be considered."

And, those facts, that the jury charge references are just those facts that were presented to the [g]rand [j]ury, so the [c]ourt - - so the [g]rand [j]ury had the information for it to make the necessary determination as to whether or not the State met its initial burden for the [g]rand [jury] proceedings, as to whether purposeful or knowing conduct was that on the part of the defendant.

So, based upon the facts that were presented to the [g]rand [j]ury, the [c]ourt is satisfied that the [g]rand [j]ury had sufficient information to draw the conclusion, that the State was able to meet its burden of proof as to the mens [rea] of the defendant in this particular case.

We find no reversible error here.

III.

Defendant now challenges the constitutionality of the Carneys Point police department's <u>Miranda</u> warning form on two grounds: (1) the form does not ask if defendant "stand[s] on his right to remain silent, and presumes he abandoned it," and (2) the form asks if defendant acknowledges his rights but not if he waives his rights, arguing that the acknowledgment constitutes a waiver. Even if the warnings were properly given, defendant argues his December 4, 2014 statement should be suppressed. We disagree.

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444-45; <u>see also</u> <u>State v. Messino</u>, 378 N.J. Super. 559, 576 (App. Div. 2005). The burden is on the State to prove defendant was informed of these rights and "knowingly, voluntarily, and intelligently waived [these] right[s]" beyond a reasonable doubt. <u>State v. Nyhammer</u>, 197 N.J. 383, 400-01 (2009); <u>see also</u> <u>State v. Presha</u>, 163 N.J. 304, 313 (2000).

Here, Carneys Point <u>Miranda</u> form read as follows:

> You have the right to remain silent and refuse to answer any questions. Anything you say may be used against you in a court of law. You have the right to consult with an attorney at any time and have him or her present before or during questioning. If you cannot afford an attorney, one will be provided, if you so desire, prior to

any questioning. And the decision to waive your rights is not final. You may withdraw your waiver whenever you wish, either before or during questioning.

Gillespie read the waiver line as "[a]nd the decision to waive your rights is not final." Defendant asserts that the form presumes he abandoned his rights. However, when read as a whole, the inference is that defendant could have withdrawn the waiver at any time. There is nothing misleading. Gillespie and Hernandez video-recorded defendant's statement, and Gillespie read defendant his rights a second time. At the suppression hearing, defendant's counsel argued that his motion should be granted because defendant did not comprehend what the word "waive" meant: he was under the influence of marijuana; was stressed out; and had cognitive limitations. The State is only obligated to inform a defendant of Miranda warnings and show that he or she understood those rights. Nyhammer, 197 N.J. at 400. A "ritualistic formula" is unnecessary. Messino, 378 N.J. Super. at 577.

Under the totality of the circumstances, we find no reversible error here. At the hearing, Judge Telsey observed defendant's demeanor and listened to his recorded statement. The judge found that "at the commencement of the statement obtained, the officer read to him his rights [. . .] and defendant

14

acknowledged, 'yes,' when he said he was willing to waive those rights, and signed the card, indicating that he acknowledge[d] receiving those rights."

With respect to his alleged impairment, Judge Telsey found he "never saw . . . where a question was asked where the answer was unresponsive, which would lead [him] to believe [defendant] was under the influence, that he wasn't understanding what was going on, or that he didn't even understand the words that were going on."

We agree that defendant voluntarily waived his Miranda rights and find no reversible error as to denial of the suppression motion. We are also satisfied that there was sufficient basis to support the trial court's exercise of discretion and we find no basis to vacate defendant's plea.

To the extent we have not addressed defendant's remaining arguments, we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1719-16T4