# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4901-18T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

G.L.L.,

     Defendant-Appellant.

_____

     Argued January 23, 2020 – Decided July 2, 2020

     Before Judges Nugent and Suter.

     On appeal from an interlocutory order of the Superior
     Court of New Jersey, Law Division, Essex County,
     Docket No. P #18004292.

     Marco A. Laracca argued the cause for appellant
     Sebastian M. Bio (Bio & Laracca, PC, attorneys; Marco
     A. Laracca, on the briefs).

     Matthew E. Hanley, Special Deputy Attorney
     General/Acting Assistant Prosecutor, argued the cause
     for respondent (Theodore N. Stephens II, Acting Essex
     County Prosecutor, attorney; Matthew E. Hanley, of
     counsel and on the brief).

Matthew S. Adams argued the cause for amicus curiae The Association of Criminal Defense Lawyers of New Jersey (Fox Rothschild, LLP, attorneys; Matthew S. Adams and Marissa Koblitz Kingman, on the brief).

PER CURIAM

On leave granted, defendant G.L.L. appeals from an order that denied his motion to quash a subpoena issued to his attorney (Defense Counsel) and compelled Defense Counsel to appear before a grand jury, produce documents, and answer many of sixty-nine questions the State proposed to ask him. Because the trial court erred in ruling the State had established the crime-fraud exception to the attorney-client privilege to some of the questions, and because the trial court did not adequately consider whether the other questions were relevant or whether there was a feasible alternative to obtain the information, we reverse and remand this matter for the trial court's further consideration.

I.

A.

Preliminarily, we note some oversights in the parties' briefs. Facts are asserted that appear to be based on documents in Defense Counsel's appendix but contain no citation to the record. See R. 2:6-2(a)(5), R. 2:6-2(b), and R. 2:6-4(a). Nor is it apparent from the briefs exactly what documents were presented to the trial court. Nonetheless, during oral argument, the parties agreed we

2

should consider the documents in Defense Counsel's appellate appendix as having been presented to the trial court. We thus recount the relevant facts from these documents.

Defendant has been charged with crimes in three complaint-warrants. The first alleges that on May 5, 2018, defendant injured the victim, his children's mother, in her residence, "by placing his hands around her neck and strangl[ing] her causing bruising on the neck," thus committing third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(13). The second alleges, among other things, that on May 9, 2018—four days after assaulting the victim—defendant entered the victim's residence and killed her, thereby committing crimes that included first-degree murder, N.J.S.A. 2C:11-3(a)(1). The third alleges defendant resisted arrest, N.J.S.A. 2C:29-2(b).

The complaint-warrant alleging assault was not issued until May 9, 2018, four days after the offense occurred, and defendant was not arrested until May 11, 2018. On May 9, Defense Counsel sent correspondence to the Newark Police Department Special Victims Unit, informed them his office had been retained to represent defendant with regard to a matter which he understood was being investigated by the Newark Police Department, and instructed the Special Victims Unit that defendant was not to be questioned in his absence. The record

does not include the time Defense Counsel sent the letter. A credit card receipt printed at 9:02 a.m. and defendant's phone location data obtained by the State corroborate defendant's retention of Defense Counsel on the morning of May 9.

The victim was murdered later that day. An affidavit of probable cause includes the following facts. The victim went to work in Newark on May 9, 2018. She left at 12:15 p.m. to go home and walk her dog. She was wearing a distinctive ring when she left. Due back at 1:15 p.m., she never returned. Text message evidence shows the victim was safe when she arrived at her home. Her last outgoing phone carrier activity was approximately 12:40 p.m. She was never heard from again.

Records related to defendant's cellular phone show that he drove to the area of the victim's place of employment. When she left, he followed her to her home. Defendant's cellular phone was then tracked from a central parking lot approaching the victim's home at approximately 12:40 p.m. The phone signals remain near or in the victim's home until they track through a courtyard to a central parking lot. Surveillance video of the parking lot picks up a man resembling defendant, moving consistently with the tracking of defendant's phone, carrying a body wrapped in a rug and setting it down. The man,

identified as defendant in the probable cause affidavit, walks back toward the victim's home.

Shortly thereafter, the victim's van is seen on the video. The van circles the lot and waits for a passerby to walk from the courtyard through the lot. The van then backs onto the sidewalk and the same man loads the body into the van through its sliding door. When the van is later recovered, a substance presumed to be blood is found in the van in the area of the body's head.

The van leaves the parking lot between 1:40 and 2:00 p.m. It is later seen parking on a street in Irvington at 4:30 p.m. Defendant exits and walks to a garage he rents. Law enforcement officers later obtained a warrant and searched the garage. They seized a bag containing mail addressed to defendant, live .40 "Blazer" ammunition, a significant quantity of heroin, and the ring the victim was wearing when she left work.

Officers arrested defendant two days later, on May 11, 2018. They saw him driving a Ford. When he spotted them, he attempted to flee. Before being apprehended, he smashed his cellular phone. Telephone records revealed that he called his brother at approximately the time he was fleeing from police.

Telephone records also show that after defendant called his brother, his brother performed Google searches, including a search for "chemicals to

disintegrate animals."  Defendant's brother also opened an article subtitled "How Long Does it Take to Dissolve a Human Body?"  Defendant's brother then turned off his phone and disappeared in his Jeep.

According to the State's brief, the following phone calls were placed from Defense Counsel's firm to defendant's cellular phone, or from defendant's cellular phone to Defense Counsel's firm, during the afternoon of the homicide: 1:56 p.m., a one-second phone call from Defense Counsel's law firm; 1:58 p.m., an eleven-second call to Defense Counsel's law firm; 2:10 p.m., an eighty-three second call from Defense Counsel's law firm; 6:30 p.m., a fifteen-second call to Defense Counsel's  law firm.  Approximately an hour after this last call, a municipal court judge issued a warrant for defendant for the assault charge.  The next day, May 10, defendant called Defense Counsel's law firm at 8:36 a.m. (eighty-six seconds) and 9:21 a.m. (eighteen seconds).  Police arrested defendant on May 11.

On June 3, 2018, police found the victim's remains in garbage bags behind an abandoned house in Irvington.  Chemicals had been used to hasten her body's decomposition.

A-4901-18T4

When defendant was taken into custody on May 11, 2018, he was arrested for the May 5 aggravated assault, not for the May 9 homicide. Defense Counsel entered an appearance for the aggravated assault charge. Defendant's detention hearing was adjourned. On the rescheduled date, defendant was arrested and charged with murder and other offenses.

After arresting defendant, prosecutors asked Defense Counsel if he would agree to be interviewed concerning the timing and circumstances of defendant's retention of his law firm. Defense counsel declined, asserting, among other reasons, the attorney-client privilege. The next day, the Essex County Prosecutor's Office subpoenaed Defense Counsel to appear before the grand jury. The prosecutor served Defense Counsel with two subpoenas: a Subpoena Duces Tecum and a Subpoena Ad Testificandum. The Subpoena Duces Tecum required Defense Counsel to produce the following documents:

> 1. Any and all retainer agreements between [Defense Counsel] and [defendant].
>
> 2. Any and all retainer agreements between [Defense Counsel] and [defendant's brother].[1]

---

[1] Defendant's brother had retained the firm on an unrelated weapons offense before defendant was charged with murder, but the firm declined to represent him after defendant was charged with murder.

7                                                          A-4901-18T4

3.    Any records of payments from, or on behalf of [defendant] to [Defense Counsel].

4.    Any records of payments from, or on behalf of [defendant's brother] to [Defense Counsel].

Defense Counsel moved to quash the subpoena. During oral argument, Defense Counsel emphasized the prosecutor had given no explanation why it wanted the documents or how they related to the case. He argued, "there is no rational basis to provide a retainer agreement and payments in a homicide case that I can think of."

The assistant prosecutor responded:

> The issue here is that there were meetings between [Defense Counsel] and his client prior to the murder occurring. And there are questions that . . . I believe are not privileged that the State needs and the grand jury needs answers to. And on a case by case basis when those questions are asked if [Defense Counsel] invokes privilege, we'll come back and litigate those questions.

Concerning the subpoenaed records, the assistant prosecutor stated:

> As to the billing records and the retainer agreement, those are being sought in this case. Again, counsel is placing on the State the onus of explaining why when the case law says quite the contrary that as a general matter retainer agreements and billing records are not privileged unless the person who has been subpoenaed for those records demonstrates a significant reason why they should not be -- or why . . . they should be privileged in this specific case. And

A-4901-18T4

there's no argument about that here. By way of a friendly proffer I will indicate that one significant use of them would be in helping guide the questioning before the grand jury into what is privileged and what isn't because there's a question about -- and I -- there's reason to believe that -- well, I don't even want to get in to too much about what there's reason to believe because I also don't want to prejudice the testimony that may come at a later time. The bottom line is one of the ways in which the State can correctly respect, which it does, the attorney/client relationship is to know what attorney/client relationships existed and when. The burden is on the defense or on the responding party in this situation to indicate why in this specific instance it should be privileged because generally speaking and as set forth more fully in the brief it's not. That being the billing records and the retainer agreements.

Based on case law holding retainer agreements and billing records are not protected by the attorney-client privilege, and without addressing whether the assistant prosecutor was required to make a threshold relevancy proffer, the court ordered Defense Counsel to turn over the records. The court further ordered Defense Counsel to appear before the grand jury and, when he considered it appropriate, invoke the attorney-client privilege. The court would then address the specific questions the prosecutor posed to Defense Counsel before the grand jury.

The court retained jurisdiction to make a final determination as to whether the attorney-client privilege applied to any question posed to Defense Counsel

9

during the grand jury proceeding.  The court denied Defense Counsel's motion for reconsideration.  This court denied Defense Counsel's motion for leave to appeal.

Defense Counsel appeared before an Essex County grand jury and asserted the attorney-client privilege in response to sixty-nine questions.  Thereafter, the State filed a motion to compel Defense Counsel to reappear before the grand jury and answer the questions.  Defense Counsel argued in opposition that by issuing the subpoena the State placed him in a position of a conflict of interest and compelled him to withdraw his representation, thereby depriving defendant of counsel of his choice.  The court rejected the argument, stating: "Well, I'll tell you what, let's get past this because I've read [the] papers and I believe that there is certainly a basis to go question by question based upon the current court exceptions."

Before undertaking a question-by-question review, the court cited the attorney-client privilege and its exceptions.  The court explained that it was required to determine,

> if the State has produced evidence that is sufficient to make the prima facie showing that a crime or a fraud was committed in connection with the attorney/client relationship.  Specifically, in this case the State argues that [it] has demonstrated prior to any charges being filed that there were in-person meetings and telephonic

communications between counsel and the defendant . . . that appear on their face to be related to an ongoing criminal activity and not to the lawful defense of the pending case.

The court added that the timing of certain telephone calls and of the crime were, in the court's estimation, "somewhat critical." Following those prefatory remarks, the court undertook a question by question analysis.

The court filed an order that stated the court had found "the crime-fraud exception removes the attorney-client privilege for questions regarding events that took place between May 9, 2018, at 1:40 P.M., through the evening of May 11, 2018, when [d]efendant . . . was arrested." The order then set forth each question and the court's disposition. We reproduce that part of the order:

1.   When did you first encounter [defendant]?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

2.   Did [defendant] come to your office on May 9th, 2018?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

A-4901-18T4

3.     When a client comes into your office, whoever it may be, [defendant] or otherwise, do you have standard client intake process that's utilized by your firm?

> The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

4.     Were any forms executed with regard to [defendant] when he came to your office on May 9th, 2018?

> The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

5.     On May 9th, 2018, when . . . [defendant] that is, came to your office, what case, if any, were you consulted about?

> The answer to this question is protected by attorney client privilege and therefore [Defense Counsel] need not answer this question.

6.     Who else was present during your meeting with [defendant] on May 9th, 2018?

> The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

7.     Were any notes taken during your -- during your meeting with [defendant] on May 9th, 2018?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

8.    Are you aware that [the victim] -- let me -- strike that. When did you first hear the name [of the victim]?

The objection was withdrawn so [Defense Counsel] shall answer the question.

9.    When did you first learn that [the victim] was deceased?

The objection was withdrawn so [Defense Counsel] shall answer the question.

10.    How did you learn of [the victim's] death?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

11.    Were you surprised when you learned of her death?

This question is not relevant and therefore [Defense Counsel] does not have to answer this question.

12.    Did you contact anyone on behalf of [defendant] at any time?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

13.    To whom did you transmit that letter?

A-4901-18T4

The objection was withdrawn, so [Defense Counsel] shall answer the question.

14.    When did you send that letter?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

15.    The date on the top of this letter is May 9, 2018, is that the date you transmitted that letter?

The objection has been withdrawn, so [Defense Counsel] shall answer the question.

16.    What time did you transmit that letter by fax?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

17.    When did you first encounter . . . the brother of [defendant]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

18.    On what occasion (i.e. dates) did you communicate with [defendant], either telephonically, or in person or otherwise?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

19.    Who else was present during any meeting or communications with [defendant's brother]?

A-4901-18T4

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

20. Did you take any notes during any of - - [those meetings]?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer the question.

21. Have you ever represented [defendant] in any matter?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

22. And in relation to representation of [defendant] when and in what matter or matters did you represent [defendant]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

23. When and in what matter or matters have you represented [defendant's brother]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

24. What money have you - you and/or your firm . . . received on behalf of [defendant]?

The answer to this question is not protected by attorney client privilege and therefore

15

[Defense Counsel] shall answer this question.

25.    What monies have been received by you or your firm on behalf of [defendant's brother]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

26.    There's no signature on the credit card receipt?

[Defense Counsel] does not have to answer this question.  However, the question "why was the receipt not signed," shall be answered by [Defense Counsel].

27.    This credit swipe based on the review of the document in front of you, Page 3 of SGJ-2, indicates this transaction occurred May 9th, 2018 at 9:02:02 a.m. Is that correct?

[Defense Counsel] [does] not have to answer this question because other sources to obtain the information are available to the State.

28.    Is this the entirety of the funds paid to you and/or your law firm on behalf of [defendant]?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

29.    Is that document the extent of the documentation that exists with regard to your retention or contracts for payment of [defendant]?

A-4901-18T4

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

30.     Does there exist a retainer agreement or contract of any type related to your retention to represent [defendant]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

31.     What documentation exists setting forth the payments owing and/or scope of your retention or your representation as it related to [defendant]?

The objection was withdrawn, so [Defense Counsel] shall answer the question.

32.     Drawing your attention to May 9th, 2018. Did [defendant] appear at your offices [at] approximately, 8:20 a.m.?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

33.     Did he remain at your office until approximately, 9:13 a.m.?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

A-4901-18T4

34. During -- during a meeting -- during your meeting with [defendant] on May -- on May 9th, 2018, did you -- did you contact anyone during that meeting?

    [Defense Counsel] does not have to answer this question because it is protected as attorney work product.

35. Did [defendant] contact anyone during that meeting?

    [Defense Counsel] does not have to answer this question because it is protected as attorney work product.

36. Did [the victim's] name come up during that meeting?

    The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

37. At any point did the identity or fact of another participant or another member of the incident for which he was seeking your representation come up? Any other people involved in the incident you were being consulted about?

    The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

38. Did the -- during your meeting on May 9th with [defendant], was there any discussion of the importance of the cooperation of a complaining witness in a domestic violence case to a prosecution?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question

39. Did the importance of [the victim] . . . as a potential witness in any case against [defendant] get discussed during that meeting?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

40. During your meeting . . . with [defendant] on May 9th, 2018, was [there] a discussion of a possible resolution of a case the way -- the way a case could resolve, whether by trial, by plea, or by a dismissal?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

41. Was the prospect of the dismissal of any possible charges discussed during the meeting with [defendant] on that day?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

42. During the meeting with [defendant] on May 9th was there any discussion of the effect of any potential charges for domestic violence affecting the child custody status of the children he shared with [the victim]?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

43.   During the meeting was there any discussion of the prospect of a conviction affecting his child custody status with the children he shares with [the victim]?

The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

44.   How was [defendant] dressed during your meeting with him on May 9th, 2018?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

45.   What was [defendant]'s demeanor during your meeting on May 9th, 2018?

The answer to this question is very subjective and therefore [Defense Counsel] does not have to answer the question.

46.   What observations of [defendant]'s emotional state did you make during your meeting on May 9th, 2018?

The answer to this question is very subjective and therefore [Defense Counsel] does not have to answer the question.

47.    After [defendant] left your office on May 9th, 2018, were you at all concerned for the safety of [the victim]?

> This question is not relevant and therefore [Defense Counsel] does not have to answer this question.

48.    On May 9th, 2018, were you aware that [the victim] was a complaining witness in the case against [defendant]?

> The answer to this question falls under the protection of the attorney-client privilege and therefore [Defense Counsel] does not have to answer the question.

49.    At what point, to your best ability to estimate time and date, did you learn that [the victim] was the complaining witness in a case against [defendant]?

> The objection was withdrawn, so [Defense Counsel] shall answer the question.

50.    Did you or someone at your office speak to [defendant] on May 8th, 2018, being the day before the meeting in your office at approximately, 2:59 p.m. for approximately 118 seconds?

> The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

51.    Following your meeting on May 9th, 2018 did you or someone at from your office attempt to call [defendant] at approximately 1:56 p.m.?

21

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

52. At 1:58 p.m. and 29 seconds on May 9th, 2018, did you or someone in your office receive a call back from [defendant]?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

53. At 2:10 p.m. and 20 seconds on May 9th, 2018, or approximately at that time did you or someone in your office call [defendant], again, and speak to him for, approximately 83 seconds?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

54. Are you aware that that series of phone calls occurred immediately following [defendant] leaving [the victim's] apartment complex in her minivan?

[Defense Counsel] shall answer this question due to the Crime-Fraud Exception.

55. Are you aware that - - at the same time [after 12:40 p.m.] while [defendant] was operating her minivan, [the victim's] body was in the back of that minivan while speaking to you and/or your law firm?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

56. What was [defendant]'s demeanor during any of these phone calls I just listed?
[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

57. What were your observations based on his voice of his emotional state during any of the phone calls that I just listed?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

58. At the time of any of these phone calls did [defendant] sound like he was in an automobile?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

59. During any of the conversations I just listed - - phone calls I just listed, did he sound like he was outside?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

60. During any of the conversations I just listed - - phone calls I just listed, did he sound like he was inside of a building?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

61.    May 9th, 2018, between noon and 1 p.m. when [the victim] was last seen alive, and June 3rd, were you aware that there was an ongoing felony of - - an ongoing indictable offense of the desecration of human remains of [the victim] and a conspiracy to desecrate the human remains of [the victim]?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

62.    Did you or someone at your firm receive a phone call from [defendant] at approximately 6:30 p.m. and 50 seconds on May 9th, 2018?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

63.    Did you or someone at your firm receive a call from [defendant] at 8:36:29 a.m. on May 10, 2018?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

64.    Did you . . . or someone at your firm receive a call from [defendant] at 9:21:43 a.m. May 10th, 2018?

The answer to this question is not protected by attorney client privilege and therefore

24

[Defense Counsel] shall answer this question.

65. Please describe your observations of the emotional state of [defendant] during the three phone calls I just listed on May 9th and May 10th?

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

66. Please describe your observations of the apparent surroundings of [defendant] as you spoke to him on those times and dates I just listed.

The answer to this question is not protected by attorney client privilege and therefore [Defense Counsel] shall answer this question.

67. At any time prior to the recovery of the body of [the victim] were you aware of your client's involvement in the disappearance of [the victim]?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

68. At any time prior to the recovery of the body of [the victim] did your client acknowledge to you any involvement in the disappearance of [the victim]?

[Defense Counsel] shall answer this question within the time for which the Crime-Fraud Exception applies.

A-4901-18T4

69. [A]t any time prior to the recovery of the body of [the victim], on June 3rd, 2018, did your client admit to you any involvement in the disappearance of [the victim]?

[Defense Counsel] does not have to answer this question.

## II.

On appeal, defendant presents the following arguments:

[I.] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ISSUED THE ORDER TO COMPEL ON IMPERMISSIBLE BASES AS THE ORDER SEEKS THE DISCLOSURE OF PRIVILEGED INFORMATION AND MATERIALS.

a. The Order to Compel impermissibly seeks testimony and documents protected by the attorney-client privilege.

b. The Order to Compel impermissibly seeks privileged testimony and documents because the crime-fraud exception does not apply in this case.

[II.] THE TRIAL COURT CLEARLY ERRED IN ISSUING THE ORDER TO COMPEL BECAUSE THE TESTIMONY AND PRODUCTION OF DOCUMENTS DIRECTED PURSUANT TO THE COURT'S ORDER WOULD HAVE A CHILLING EFFECT ON [DEFENDANT'S] SIXTH AMENDMENT RIGHT TO COUNSEL IN THIS ACTION.

[III.] THE TRIAL COURT CLEARLY ERRED IN ISSUING THE ORDER TO COMPEL BECAUSE THE ORDER IS UNENFORCEABLE AS IT IS AN ABUSE OF THE GRAND JURY PROCESS.

[IV.] THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING THE ORDER TO COMPEL BECAUSE THE ORDER IS UNENFORCEABLE BASED ON THE NEW JERSEY RULES OF PROFESSIONAL CONDUCT.

Amicus, The Association of Criminal Defense Lawyers of New Jersey, adds the following arguments:

I. THE COURT'S ORDER DIRECTING DEFENSE COUNSEL TO PRODUCE DOCUMENTS AND PROVIDE TESTIMONY WOULD HAVE A CHILLING EFFECT ON A DEFENDANT'S SIXTH AMENDMENT RIGHT TO COUNSEL IN THIS ACTION.

A. The Deleterious Impact of Serving a Subpoena on an Accused's Current Attorney in the Matter for which the Attorney has been Retained is Recognized under New Jersey Law.

B. Forcing an Attorney to Produce Documents and Testify Against His Client Inevitably Creates a Disqualifying Conflict of Interest for Defendant's Chosen Counsel.

C. The Details Sought by the State in the Grand Jury Subpoena, Including the

27

Details Surrounding the Retention of Counsel, Cannot be Used Against the Defendant.

## II. BECAUSE LESS INTRUSIVE MEANS EXIST TO OBTAIN THE INFORMATION SOUGHT IN THE SUBPOENA, THE STATE IS NOT PERMITTED TO SUBPOENA DEFENSE COUNSEL.

Our analysis of these arguments is guided by the following legal principles. Grand jury proceedings are presumed valid. State v. Francis, 191 N.J. 571, 587 (2007). For that reason, a "defendant bears the burden of proving that the prosecutor misused the grand jury for an improper purpose." Ibid.

When analyzing claims of grand jury abuse, "courts have distinguished between pre- and post-indictment grand jury proceedings in determining what standard is to be applied[.]" Id. at 589.

> [B]ased on whether the State's challenged use of the grand jury occurred pre- or post-indictment, different rules apply in respect of grand jury abuse claims. In the pre-indictment setting, the inquiry must focus on whether the evidence the State sought was relevant to the crimes under investigation. If the claims of grand jury abuse arise in respect to use of the grand jury after an indictment has been returned, we join the unbroken line of authority that holds that such use of the grand jury is permitted unless the dominant purpose of that use was to buttress an indictment already returned by the grand jury. Post-indictment, the State may continue to use the grand jury to investigate additional or new charges against a defendant. However, once an indictment is returned, the State may not use the grand

> jury to gather evidence solely in respect of the charges already filed.
>
> [Id. at 591-92.]

Thus, "[i]n the pre-indictment setting, the inquiry must focus on whether the evidence the State sought was relevant to the crimes under investigation." Id. at 589. This standard applies not only to testimonial evidence such as that in Francis, id. at 577-79, but also to documentary evidence, State v. McAllister, 184 N.J. 17, 34-35 (2005).

If a defendant challenges the validity of a grand jury subpoena, "the State need establish preliminarily merely (1) the existence of a grand jury investigation and (2) the nature and subject matter of that investigation, in order to overcome the challenge." In re Grand Jury Subpoena Duces Tecum v. State, 167 N.J. Super. 471, 472 (App. Div. 1979). "Insofar as relevancy is concerned, all that need be shown by the State is that the documents subpoenaed bear some possible relationship, however indirect, to the grand jury investigation." Id. at 473 (citation omitted).

Even if evidence is relevant to a grand jury investigation, the State may be prohibited on other grounds from presenting such evidence. No one would seriously dispute, for example, the general proposition that communications between a defendant and his attorney made "in the course of that relationship

A-4901-18T4

and in professional confidence" are privileged, N.J.S.A. 2A:84A-20, N.J.R.E. 504, and beyond the reach of a prosecutor presenting a case against the defendant to the grand jury.  Our courts "vigorously" protect the privilege. Weingarten v. Weingarten, 234 N.J. Super. 318, 324 (App. Div. 1989).  "[T]he lawyer's duty to respect confidences is beyond dispute, . . . and receives zealous enforcement . . . .  Even in the courtroom, where the search for truth is of singular importance, an evidentiary privilege surrounds those confidences.  Only the client may waive the protection."  State v. Sugar, 84 N.J. 1, 13 (1980) (citations omitted).

In extraordinary and "the most narrow circumstances," the attorney-client privilege can be pierced.  See State v. Mauti, 208 N.J. 519, 538-39 (2012). Those circumstances may exist where a countervailing constitutional right is at issue and where a party has expressly or impliedly waived the privilege.  Id. at 539.  Even in the former instance, however, the attorney-client privilege cannot be pierced unless the party asserting the countervailing constitutional right can demonstrate a legitimate need for the evidence, the evidence is relevant and material to the issue before the court, and by a fair preponderance of the evidence, the information cannot be secured from any less intrusive source.  In re Kozlov, 79 N.J. 232, 243-44 (1979).

In Mauti, the Court concluded the State could not pierce the spousal privilege embodied in N.J.R.E. 501(2) by application of the criteria announced in Kozlov because, among other reasons, the State failed to establish the third requirement. The Court determined the testimony the State sought to elicit from the spouse could be established through other witnesses and the spouse's testimony could thus be "fairly characterized as corroborative, not indispensable, to the State's case against [the] defendant." Mauti, 208 N.J. at 542 (quoting State v. Mauti, 416 N.J. Super. 178, 194 (App. Div. 2010)).

In addition to these narrow circumstances in which the attorney-client privilege can be pierced, N.J.S.A. 2A:84A-20 and N.J.R.E. 504 contain express exceptions to the privilege. One exception is "a communication in the course of legal service sought or obtained in aid of the commission of a crime or fraud[.]" N.J.S.A. 2A:84A-20; N.J.R.E. 504.

To establish the crime-fraud exception and thus the right to question an attorney before a grand jury about communications with a client, the State must establish "'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'" In re Selser, 15 N.J. 393, 409 (1954) (quoting Clark v. United States, 289 U.S. 1, 15 (1933)).

A prosecutor's presentation of evidence to a grand jury is also circumscribed by the Rules of Professional Conduct. RPC 3.8 provides:

> The prosecutor in a criminal case shall:
> . . . .
> (e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence about a past or present client unless the prosecutor reasonably believes: (1) either the information sought is not protected from disclosure by any applicable privilege or the evidence sought is essential to an ongoing investigation or prosecution; and (2) there is no other feasible alternative to obtain the information[.]

Having considered the facts presented to the trial court in light of these principles, we conclude the trial court erred and the order compelling Defense Counsel to appear before the grand jury must be vacated. We thus reverse and remand this matter for further consideration.

## III.

Because the argument points framed by the parties present questions of law to be determined on undisputed facts, our review is plenary. State v. Schubert, 212 N.J. 295, 303-04 (2012). Applying that standard, we conclude the State made an insufficient showing that the crime-fraud exception to the attorney-client privilege applied.

The State sought to elicit information obtained by Defense Counsel from two sources: his morning meeting with defendant four days after the victim was

32

assaulted, which was the same day she was murdered; and six telephone calls, four made the same day later in the afternoon and two made the next morning. Defense Counsel sought to quash the grand jury subpoenas issued to him on the grounds the State was attempting to violate the attorney-client privilege and was abusing the grand jury. Considering these arguments in light of the legal principles previously discussed, three questions require answers: did the questions posed by the State require Defense Counsel to violate the attorney-client privilege; if not, were the questions relevant; and, if so, was there a feasible alternative to obtain the information. We disagree with the trial court's determination of the first of these questions insofar as the court concluded the State had presented sufficient evidence to establish the crime-fraud exception. We conclude the trial court's analysis concerning the second and third questions was incomplete.

The trial court's order states "the crime-fraud exception removes the attorney-client privilege for questions regarding events that took place between May 9, 2018, at 1:40 p.m., through the evening of May 11, 2018, when [defendant] was arrested." In other words, the trial court found the attorney-client privilege protected communications between Defense Counsel and

defendant during their morning meeting, but not during the phone calls. Concerning the phone calls, the trial court's sole finding related to their timing:

> Now, the [c]ourt has to decide, first off, if the State has produced evidence that is sufficient to make the prima facie showing that a crime or a fraud was committed in connection with the attorney/client relationship. Specifically, in this case the State argues that it has demonstrated prior to any charges being filed that there were in-person meetings and telephonic communications between counsel and the defendant . . . that appear on their face to be related to an ongoing criminal activity and not to the lawful defense of the pending case.

> So, timing of these calls and of the crime itself is obviously in this [c]ourt's estimation somewhat critical. So, there [were] a lot of questions. I think there [were] over [sixty] or more questions posed to [Defense Counsel] at the grand jury and I think the most logical way to handle this is to go question by question and indicate what is privileged and what is not privileged.

The court did not comment on the State's argument after repeating it. The argument was inaccurate. Nothing in the record suggests there was more than one meeting between Defense Counsel and defendant on the day of the homicide. Moreover, the record is devoid of any evidence of the content of the discussions between Defense Counsel and defendant, so the argument the "meetings" and telephone conversations "appear on their face to be related to an ongoing criminal activity" has no factual support. The sole "finding" the court

made was "the timing of these calls and of the crime itself is obviously in this [c]ourt's estimation somewhat critical." That singular finding is inadequate to establish prima facie evidence of some foundation in fact.

To be sure, three of the four calls that were transmitted between the telephone in Defense Counsel's office and defendant's cellular phone were placed during the time defendant appeared to be transporting the victim's body. But the first call, which lasted one second, was made from Defense Counsel's office. The second call, which occurred two minutes later, was initiated from defendant's cellular phone and lasted only eleven seconds. The third call, which lasted eighty-three seconds, was made from Defense Counsel's office. Those calls must be considered against the backdrop of defendant having allegedly committed an act of domestic violence four days earlier and Defense Counsel having prepared a letter to police explaining that if they arrested defendant, they were not to question him in Defense Counsel's absence.

Nothing in the record suggests the one-second and eleven-second phone calls involved conversations between Defense Counsel and defendant, rather than their merely leaving messages, let alone conversations about the ongoing crime defendant was allegedly committing. The same can be said of the fifteen-second call placed from defendant's cellular phone to Defense Counsel's office

at 6:30 in the evening.  Assuming it can reasonably be inferred that Defense Counsel and defendant spoke during the eighty-three-second telephone call placed from Defense Counsel's office at 2:10 in the afternoon, it is sheer speculation to suggest the topic was the homicide, not the assault for which defendant had apparently retained counsel earlier that day.

The same is true for the eighty-six second and eighteen-second calls placed by defendant to Defense Counsel's office the following morning. Significantly, a warrant had been issued the previous evening for defendant's arrest on the assault charge.  It is sheer speculation that these calls were somehow related to the homicide and not the assault.

In short, the State's suggestion that the timing of the telephone calls during the commission of a crime suggested they were related to that crime—without any consideration of whether defendant had retained Defense Counsel on the morning of May 9 for a crime he had allegedly already committed, any consideration of the content of Defense Counsel's letter to the police, or without any consideration of Defense Counsel's initiation of the original flurry of calls— amounts to nothing more than surmise and conjecture.  We consider the requirement of demonstrating the crime-fraud exception to the attorney-client privilege through prima facie evidence that it has some foundation in fact to

require more than such speculation. Accordingly, we conclude the trial court erred when it determined the State had made a sufficient showing to establish the crime-fraud exception to the attorney-client privilege.

We further conclude the trial court's analysis of whether the information sought by the questions was relevant to the crimes under investigation and whether there was no other feasible alternative to obtain the information was inadequate. For the most part, the trial court conducted no such analysis, but rather determined only whether the information sought by a particular question did or did not fall within the attorney-client privilege.

For example, the prosecutor asked defense counsel, "when a client comes into your office, whoever it may be, [defendant] or otherwise, do you have [a] standard client intake process that's utilized by your firm?" The relevancy of that question to either the assault investigation or the homicide investigation is difficult to discern.

Another example is the prosecutor's question, "[h]ow was [defendant] dressed during your meeting with him on May 9th, 2018?" The purpose of this question was presumably to establish defendant was dressed in the same clothes in Defense Counsel's office that he wore when he lifted the victim's body into the van, as depicted in a surveillance video. Yet, the affidavit of probable cause

A-4901-18T4

submitted with the record states defendant is the person in the surveillance video. The trial court never inquired whether, given the information contained in the affidavit of probable cause, information from Defense Counsel about defendant's clothing was "fairly characterized as corroborative, not indispensable, to the State's case against [the] defendant." Mauti, 208 N.J. at 542. Perhaps the facts in the affidavit of probable cause were overstated, or perhaps it is not readily apparent from the video surveillance or the corroborating cellular telephone location information that it was defendant who placed the victim's body into the van and drove away. But the prosecutor was never asked for an explanation, so we are unable to make such a determination from the record before us.

For these reasons, we vacate in its entirety the trial court's order. We remand this matter so that the trial court can undertake a proper analysis of the questions posed by the prosecutor. The prosecutor should obviously be afforded the opportunity to make proffers concerning seemingly irrelevant information and to explain why certain information he seeks from Defense Counsel is indispensable to the investigation rather than merely corroborative of evidence identified in other sources, such as the affidavit of probable cause.

A-4901-18T4

IV.

Defense Counsel and amicus argue that subpoenaing Defense Counsel to testify before a grand jury investigating crimes allegedly committed by his client will have a chilling effect on defendant's Sixth Amendment right to counsel. They also argue the issuance of the subpoena creates a conflict of interest for Defense Counsel, which may prohibit his representation of defendant and thereby impinge upon defendant's right to counsel.

The importance of a defendant's right to counsel and the attorney-client privilege cannot be understated:

> If the rule of law is this nation's secular faith, then the members of the Bar are its ministers. A lawyer is the mediator between his client's desires and the sovereign's commands. His aid is sought because of the relative ignorance of those to whom the law is but a collection of dim mysteries. When confronted with the awesome power of the criminal process, a client is never more in need of professional guidance and advocacy. In this setting, an instinct for survival compels a defendant to confide in an attorney. The necessity of full and open disclosure by a defendant, see American Bar Ass'n, Code of Professional Responsibility, EC 4-1 at 21C (1976), imbues that disclosure with an intimacy equal to that of the confessional, and approaching even that of the marital bedroom. Cf. Griswold v. Connecticut, 381 U.S. 479, 484-486 (1965).
>
> [Sugar, 84 N.J. at 12-13.]

39

The concerns of Defense Counsel and amicus are thus well-founded. As one court has noted,

> [t]hat there are latent ethical issues in the serving of a subpoena on actual or prospective counsel opponent should be perceived without much difficulty. Even where an indictment may not have issued, and thus technically the attorney/witness is not yet an "adversary," since the subpoena . . . seeks to compel evidence concerning a person who is represented by the attorney/witness, it relates to an established attorney-client relationship. The serving of a subpoena under such circumstances will immediately drive a chilling wedge between the attorney/witness and his client. This wedge is the natural consequence of several underlying factors created by this anomalous situation. Most obvious is the fact that the client is uncertain at best, and suspicious at worst, that his legitimate trust in his attorney may be subject to betrayal. And because the subpoenaed attorney/witness may himself feel intimidated, this may in fact take place if there is not even minimal ethical control regulating the subpoenaing of an attorney/witness to seek evidence against his client.
>
> [United States v. Klubock, 832 F.2d 649, 653 (1st Cir. 1987).]

Nonetheless, a defendant cannot use the right to counsel or the attorney-client privilege to facilitate the commission of crimes. Moreover, the legal and ethical principles that circumscribe the State's issuance of grand jury subpoenas to defense attorneys provide a proper balance between a defendant's right to

counsel and the attorney-client privilege on one hand, and the State's need to develop and present relevant evidence to a grand jury on the other.

When these rights and needs clash and cannot be resolved by the parties, a court's considered application of the attorney-client privilege, the quantum of evidence required to establish the crime-fraud exception to the privilege, the need for relevancy of information known to an attorney to the criminal investigation at issue, and the ability of the State to obtain such evidence from other sources, safeguards and balances the competing interests. Such considered application of these principles did not take place here. Accordingly, we reverse and vacate the trial court's order. We remand for the trial court's consideration of relevancy and a feasible alternative source of the information the State seeks from questions it still proposes to ask defendant. The trial court shall not reconsider the crime-fraud exception to the attorney-client privilege, as we have determined as a matter of law it does not apply. Defense Counsel shall not be compelled to answer questions concerning information protected by the attorney-client privilege.

Reversed and remanded for further consideration consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4901-18T4